536 So.2d 504 (1988)
George THOMPSON, Ervin Hillard, and Rosie Mary Hillard, Individually as Widow of Elvin Hillard, as Administrator of the Estate of Elvin Hillard, and as Tutor of the Minor Child Tangie Hillard
v.
PETROUNITED TERMINALS, INC. and Louisiana Vacuum Services, Inc.
No. 88 CA 0488.
Court of Appeal of Louisiana, First Circuit.
November 22, 1988.
Writ Denied January 27, 1989.
*506 Arthur Howell Andrews, Dale M. Maas, Baton Rouge, for plaintiffs-first appellants George Thompson, et al.
George E. Cain, Francis H. Brown, III, New Orleans, for defendant-second appellant PetroUnited Terminals, Inc.
William Henry Sanders, Jena, for defendant-appellee Jerry Williamson.
Donald T.W. Phelps, John Swanner, Seale, Smith & Phelps, Baton Rouge, for defendant-appellee Appleton Elec. Co.
Kirk A. Bergeron, Baton Rouge, for defendant-appellee.
Edward F. Glusman, Baton Rouge, for intervenor-United General Ins. Group.
Before WATKINS, CRAIN and ALFORD, JJ.
WATKINS, Judge.
This is a wrongful death and personal injury suit involving an explosion and fire in a storage tank containing the chemical toluene. During the explosion and fire George Thompson and Ervin Hillard were injured and Elvin Hillard died. The plaintiffs brought suit for survival, wrongful death and personal injuries sustained in the accident.

FACTS
On December 9, 1982, an explosion and fire occurred in a storage tank at a bulk storage facility (tank farm) owned and operated *507 by PetroUnited Terminals, Inc. (Petro) in Iberville Parish, Louisiana. At the time of the fire the tank was being cleaned by George Thompson, Ervin Hillard and Elvin Hillard, employees of Serv-Tech Specialties of Baton Rouge, Inc. (Serv-Tech). Serv-Tech contracted with Petro to clean the tank. The tank contained toluene, a highly flammable, very volatile hydro-carbon which is both an asphyxiant and intoxicant.
The tank cleaning operation took two days. The first day was consumed with pumping out the excess toluene. On the second day George Thompson, Ervin Hillard and Elvin Hillard were required to enter the tank to remove any toluene which remained in the depressions within the floor of the tank and to completely dry the tank. At this point the men were unaware of what the tank contained and that the atmosphere they were working in was highly explosive.[1] The work within the tank consisted of moving the excess toluene with squeegees to a central location where a vacuum hose could siphon it out of the tank. Elvin Hillard also moved the excess toluene by blowing it with an air hose. The tank was vented to the atmosphere through a top manway cover which was open and with a fresh air mover which was located at ground level and was forcing air into the tank through another open manway cover. The cleaning crew used two Appleton flood lamps in the tank as well as wearing fresh air masks, slicker suits and hard hats.
The cleaning operation was progressing as planned until apparently the air/toluene mixture inside the tank reached a combustible ratio, whereupon an explosion and fire erupted inside the tank. At the moment of combustion George Thompson was inside the tank near an open manway and was blown outside the tank. Elvin Hillard was apparently trapped inside the tank by a fallen beam and burned to death. Ervin Hillard was looking inside an open manway and was blown backward a number of feet, striking the outside of an adjacent tank and receiving a ruptured disc. Ervin made an unsuccessful attempt to enter the tank to rescue Elvin Hillard, his brother, who, for several minutes, called out to him for help.
Initially suit was brought by George Thompson, Ervin Hillard and Rosie Hillard, Elvin Hillard's widow, against Petro and Louisiana Vacuum Services, Inc., the supplier of the vacuum truck. Later the plaintiffs' petition was amended to add Appleton Electric Company, the manufacturer of the flood lamps used to illuminate the interior of the tank, and General Electric Company, the manufacturer of the light bulbs used in the flood lamps. United General Insurance Company (United) intervened as the workmen's compensation carrier for benefits and medical expenses paid.
Prior to trial, General Electric and Louisiana Vacuum Services obtained summary judgments dismissing them from the case. Thereafter, Appleton settled with the plaintiffs and was dismissed, leaving Petro as the only remaining defendant. After a four-day trial the court rendered judgment from the bench apportioning fault in equal shares of 33 1/3 to Petro, Serv-Tech and Appleton. The court made the following conclusions in its oral reasons for judgment.
I hereby render that opinion, and it's based on the proposition that this light was not adequately marked with adequate warnings under the conditions and circumstances of its use at this time.
That Serv-Tech was negligent in letting their menundertaking such a project at all under those conditions without proper guidelines and proper procedures and checking of the light.
And that PetroUnited was negligent in this respect: They're in an inherently dangerous occupation and business, and it's not something you can contract away.
As between Serv-Tech and PetroUnited you can contract it away, but you *508 can't contract it away as between the Hillards and the Thompsons and the neighboring community and PetroUnited. They're under some responsibility.
I don't care whether they read the guidelines or 2015 or American Petroleum Institute or what have you, it's common sense and prudence dictate that they should have had some supervision over the methods used. You can't just call people and say, "Clean my tank" and without undertakingwithout undertaking those responsibilities, this Court believes that they are liable for having in their possession this inherently dangerous product and tank which they allowed this company to come in and commit their negligence.
And, of course the light company is absent from the case, but I do find that they had a degree of negligence also.
The court went on to find that the plaintiffs were not at fault. The issue of damages was taken under advisement and after consideration damages were awarded as follows:

Rosie Hillard Survival and wrongful death actions for her husband, Elvin Hillard
 Survival:
 Pain and suffering $ 15,000.00
 Hospital bills 59.50
 Wrongful death:
 Funeral expenses $ 3,462.30
 Lost support
 ½ × $232,700 = 116,350.00
 Loss of love and affection 25,000.00
 ___________
 TOTAL $159,871.80
George Thompson - for his personal injuries
 Medical Bills $ 46,002.01
 Pain and suffering 25,000.00
 Pre-trial lost wages 27,719.07
 Post-trial lost wages
 20% × $170,100 = 34,020.00
 ___________
 TOTAL $132,741.08
Ervin Hillard - for his personal injuries
 Medical bills $ 23,388.46
 Pre-trial lost wages 29,000.00
 Post-trial lost wages
 20% × $170,000 = 34,000.00
 Pain and suffering, mental
 anguish 25,000.00
 Future medical expenses 20,000.00
 ___________
 TOTAL $131,388.46

The court reduced each plaintiff's award by two-thirds, representing the percentage of negligence apportioned to Appleton and Serv-Tech as joint tortfeasors. The court further reduced the remaining awards by the amounts paid by United, as worker's compensation carrier for Serv-Tech. The court also recognized a lien of Our Lady of The Lake Regional Medical Center, in accordance with LSA-R.S. 9:4751 et seq., in the amount of $3,753.15 representing medical expenses incurred by Ervin Hillard for personal injuries he received as a result of this accident.
*509 Plaintiffs appeal the trial court decision alleging the following errors:
I. The trial court erred in finding Appleton Electric at fault.
II. The court erred in reducing the judgment awarded to plaintiff by the fault of Serv-Tech.
III. The trial court erred in allowing the intervenor to recover the entire amount of its intervention out of the awards for pain and suffering.
IV. The court erred in granting the grossly inadequate awards to all appellants.
Defendant Petro also appealed alleging trial court error in apportioning fault equally between Appleton, Serv-Tech and Petro, and in assigning no fault to plaintiffs. The defendant suggests that a more appropriate apportionment of fault would be: Appleton 60%, Serv-Tech 20%, Petro 20%.

NEGLIGENCE OF APPLETON
During the tank cleaning operation on December 9, 1982, the Serv-Tech crew used two light fixtures (flood lamps) which were manufactured by Appleton, owned by Serv-Tech and selected by Elvin and Ervin Hillard for use within the tank. Unfortunately, these lights were not explosion proof and were not designed for use in an explosive atmosphere. Each light fixture displayed the following label on its housing: "For Use in Wet Locations".
Although Appleton was dismissed from the suit, the trial court found them 33 1/3 percent negligent. The plaintiffs assert that the trial court erred in finding Appleton negligent while Petro contends that the light fixtures were unreasonably dangerous to normal use and that Appleton's percentage of fault should be increased from 33 1/3% to 60%.
The evidence with regard to Appleton's negligence was primarily the expert testimony of Mr. Dennis Howard and Mr. John Mertens. A determination of their credibility and reliability is largely a matter of fact for the trial court to decide and a finding in this regard will not be overturned unless it has no reasonable basis and is manifestly erroneous. Anthony v. Hospital Service Dist. No. 1, 477 So.2d 1180 (La.App. 1st Cir.1985), writ denied, 480 So.2d 743 (La.1986). However, when the trial court's reasons do not articulate the theory of the evidentiary facts[2] upon which its conclusion is based, we are unable to give the finding the usual deference attributed to decisions of triers of fact. See Bloxom v. Bloxom, 512 So.2d 839, 843 (La.1987).
The expert testimony established that the most probable source of ignition causing the explosion was one of the Appleton light fixtures. This conclusion was based primarily on the fact that the normal bulb surface temperature alone was sufficient to ignite toluene vapors. The experts were unable to conclude that the lights caused the explosion due to a design or manufacturing defect. Furthermore, the evidence did not preponderate to establish the hypothesis that some other alleged defect within the lamp (such as arcing) caused the explosion. In view of the evidence presented, we find no reasonable factual basis for finding that the lights were unreasonably dangerous to normal use per se or unreasonably dangerous due to either a manufacturing defect or design defect.
The only remaining theory of products liability to consider is the manufacturer's failure to provide an adequate warning. Under this theory the court must determine whether the product was (1) in normal use at the time of the incident; (2) whether the manufacturer gave an adequate warning; and (3) whether there is a causal connection between the failure to give an adequate warning and the damages. See generally Bloxom, supra. In Bloxom, the Supreme Court explained:
In order to recover from a manufacturer, the plaintiff must prove, among other essentials, that his damage resulted from *510 a condition of the product that made it unreasonably dangerous to normal use. "Normal use" is a term of art that includes all intended uses, as well as all foreseeable uses and misuses of the product.
A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user. In the context of the manufacturer's duty to warn of the dangers in the use of a product, the manufacturer is obligated to anticipate the environment in which the product will be used and to give notice of the potential risks arising from foreseeable use in the foreseeable environment. Although a manufacturer markets a product for an intended use, in considering various instructions and warnings, a manufacturer may not simply close his eyes to hazards associated with foreseeable misuse of the product. When product misuse and its attendant risks are reasonably foreseeable, the manufacturer is in the best position to avoid product related injuries by giving an adequate warning. (Citations omitted)
Id. at 843.
Based on the above precepts, and the facts of this case, the court must determine whether the use of the Appleton light fixture, labeled "For Use in Wet Locations", in an explosive environment is a foreseeable use or misuse of the product and if so whether there is a causal connection between the failure to give an adequate warning and the plaintiffs' damages.
Two experts testified concerning Appleton's failure to warn. Mr. Dennis Howard, a safety expert, testified that he considered the language on the lights to be misleading and that Appleton should have included a warning that the light was not suitable for hazardous environments. Mr. Howard gave no basis for his opinion that the warning was inadequate other than the fact that Serv-Tech employees assumed the light was explosion-proof.
Mr. John Mertens, an expert in the evaluation of products involved in fires, testified in his deposition that the tank cleaning industry is a highly specialized area with numerous hazards involved. It was his opinion that "[t]here is no way possible that warnings can take the place of adequate training to use the proper equipment for that proper area. It's impossible to do that." Mr. Mertens explained that when working in an explosive environment a worker is trained to look for a specialized well recognized label which specifically lists the environments in which the product may be used. The label spells out different class and group categories which indicate the environment in which it can be used. It is then up to the user to interpret the class and group ratings to determine whether that product will work for the environment in which it will be used. Not all explosion-proof lights can be used in every area in anticipation of explosions. He went on to conclude that because there are such a large number of products using electricity, and the use of such equipment in hazardous environments is so small, it would be impractical to label all of them. Mr. Merten's testimony concerning explosion-proof light fixtures was corroborated at trial by George Flach, an expert in electrical engineering.
When experts offer their opinions they should state the facts upon which their opinions are based; an expert's opinion is only as valuable as the factual basis upon which it is predicated. Gardiner v. Commercial Union Ins., 488 So.2d 1331 (La. App. 3d Cir.1986). After considering the expert testimony in this case, we find Mr. Mertens' opinion is better supported and conclude that the use of a waterproof light in a highly explosive environment is not a foreseeable use or misuse of the product. We find it reasonable for a manufacturer to assume that a person working in a potentially explosive environment has been properly trained in the use of lighting equipment. Furthermore, based on the testimony of the plaintiffs, even if the light they chose had been explosion-proof they would not have been able to interpret the class and group categories to determine whether the light was safe to use in the particular explosive environment in which *511 they were working. Accordingly, we find Appleton free from fault and reverse that portion of the trial court's decision finding Appleton 33 1/3 percent negligent.

FAULT OF PLAINTIFFS
Petro contends that the trial court erred in not finding the plaintiffs at fault. In its reasons for judgment the trial court explained that it did not consider the workmen to be at fault because they were only following the orders of their employer. We find no error in this conclusion.
In order to be contributorily negligent, a plaintiff's conduct must fall below the standard to which he should conform for his own safety and protection, the standard being that of a reasonable man under like circumstances. Straley v. Calongne Drayage & Storage, Inc., 346 So.2d 171 (La. 1977).
In the present case the plaintiffs were acting within the scope of their employment and were therefore subject to the working conditions and working orders of their employer. Under similar circumstances we have held that a workman whose duties require that he work in hazardous circumstances who is injured while doing his best to discharge those duties is not guilty of contributory negligence even though he is fully aware of the risk of injury to which he is subjected while performing his work. O'Keefe v. Warner, 288 So.2d 911 (La.App. 1st Cir.1973), writ denied, 293 So.2d 170 (La.1974). See also Marzula v. White, 488 So.2d 1092 (La.App. 2d Cir.1986).
The facts in the instant case show that, at the time of the accident, Elvin Hillard, Ervin Hillard and George Thompson had not been told that the chemical which they were cleaning was highly explosive. The facts also show that the men were doing their best to discharge their duties as they had been instructed by their supervisors. In the absence of any warnings or instructions to the contrary, we cannot say that the plaintiffs' actions in cleaning the tank were unreasonable. Moreover, they had used the same procedure in the past without incident. Accordingly, we find no error in the trial court's conclusion that the plaintiffs were not at fault.

FAULT OF SERV-TECH
After a careful review of the evidence we are convinced that Serv-Tech is guilty of gross negligence and callous disconcern for the well-being of its employees.
The expert testimony established the following mistakes during the tank cleaning operation: (1) The tank itself was not blinded off; (2) The tank's atmosphere was highly explosive, a condition which resulted from the tank being empty for more than a week, allowing all the vapor space to become saturated with toluene. This created a situation which was very dangerous to life and health; (3) The workmen were permitted to enter an explosive environment, a practice which should be forbidden except in a rescue attempt; (4) The men were not instructed in the proper use of the fresh air equipment as they were complaining of strong vapors and not being able to remain in the tank for more than 15 minutes; (5) They brought in lights which were totally inadequate for an explosive atmosphere; (6) They were blowing air into a rich mixture which was way above the upper explosive limit for toluene, thus gradually making it highly explosive; (7) The equipment used in and around the tank was not grounded.
According to Mr. Frederick Broussard, an expert safety professional, the proper way to clean Petro's tank would have been to suction as much of the toluene as possible from a position outside of the tank and then vent the tank and let the toxic flammable materials exhaust into the air. The next step would be to shut down the air moving machines for fifteen minutes, and then take a gas test. Entry into the tank is permissible when the lower flammable limit is within the 10-20 percent range. This determination should be according to the owner's safety rules.
The facts in this case clearly establish that Elvin Hillard, Ervin Hillard and George Thompson were not told that the tank which they entered contained an explosive chemical. Notwithstanding that *512 fact, Elvin and Ervin Hillard were permitted to select the lighting equipment for use inside the tank. During the cleaning operation, Serv-Tech had a project supervisor and two job supervisors at the tank site overseeing the job. The supervisors did not test the tank's atmosphere prior to ordering the plaintiffs to enter, they did not question the use of the waterproof light fixtures, and they did not question the fact that the equipment being used in and around the tank was not grounded. Furthermore, they did not require the use of safety lines on the men who entered the tank.
The facts also show that the explosive environment within the tank was caused by Serv-Tech's imprudent use of air movers pushing air through the tank. While this procedure would have been prudent if there were no men inside the tank, it was a highly dangerous method to use when allowing men to enter the tank. The introduction of fresh air into the very rich environment of toluene vapors caused the vapors to become highly explosive. One expert explained that when the men first entered the tank they could have brought in a blowtorch and would not have been able to ignite the vapors, but as they aspirated air into the tank they gradually built up an explosive mixture.
Every expert to testify stated, without exception, that no person should enter a confined explosive environment under any circumstances except to attempt a rescue. This was the first rule which Serv-Tech violated in this inept scenario. The second and fatal violation was the introduction of completely inadequate light fixtures into the environment. So inadequate were these lights that the mere surface bulb temperature alone was sufficient to ignite toluene vapors. In view of the foregoing we are compelled to find that Serv-Tech was negligent in the death of Elvin Hillard and in the injuries to Ervin Hillard and George Thompson. We defer a discussion of the apportionment of liability pending determination of Petro's fault, if any.

FAULT OF PETROUNITED
The remaining question is whether Petro, as the owner of the chemical tank and employer of Serv-Tech, is responsible for the improper cleaning methods used by Serv-Tech. The plaintiffs contend that Petro was negligent in the manner in which it hired Serv-Tech and in the manner in which it monitored the methods used in the cleaning of the tank.
Initially we conclude that Serv-Tech stood in the relationship of an independent contractor to Petro. The representatives for Petro and Serv-Tech testified that they contracted the cleaning of this particular tank over the telephone, a normal practice between the two companies. No written agreement was made nor were any guidelines discussed as to how the job was to be performed, or what safety precautions were to be taken. Serv-Tech was only required to abide by Petro's general safety rules. These safety rules made no reference to methods of tank cleaning or safety procedures during such activity as Petro had no one in its employ with knowledge of how to clean a tank containing a flammable chemical. Serv-Tech understood that it was responsible for deciding what work methods and safety precautions would be used to clean the tank and that Petro would not control the project. Based on these facts we conclude that Serv-Tech was an independent contractor in relation to Petro. See Smith v. Crown Zellerbach, 486 So.2d 798 (La.App. 1st Cir.), writ denied, 489 So.2d 246 (La.1986).
Under Louisiana law, a principal is generally not liable for the offenses an independent contractor commits in the course of performing its contractual duties. An exception to this rule has been recognized where the work which the independent contractor is hired to perform is inherently or intrinsically dangerous unless proper precautions are taken to avoid injury. Ewell v. Petro Processors of Louisiana, Inc., 364 So.2d 604 (La.App. 1st Cir. 1978), writ denied, 366 So.2d 575 (La.1979). Thus the employer cannot avoid liability by letting out inherently or intrinsically dangerous work to an independent contractor. *513 Furthermore, "[w]here an available safe method, which includes the taking of adequate precautions, will render it at least ordinarily safe, and the work is done in an unsafe manner, the employer will be liable if he has expressly or impliedly authorized the particular manner which will render the work unsafe, and not otherwise." Ewell, supra at 606-607.
The evidence clearly establishes that cleaning a tank containing a highly explosive chemical is inherently dangerous. The expert testimony revealed that toluene is a highly explosive chemical as well as an asphyxiant and intoxicant, which can cause severe or fatal injuries when inhaled. These propensities combined with the slightest human error or misjudgment culminate in disaster. So dangerous and injurious is this work that the leading independent petroleum associations have for decades published guidelines to prevent or lessen the dangers associated with this type of work. The associations have attempted to educate tank owners through these publications and seminars. Two men instrumental in the writing of the American Petroleum Institute's (API) suggested guidelines testified on behalf of the plaintiffs.
The first expert to testify was Frederick Doherty Broussard, a safety professional, who has been involved in tankage and the cleaning of tankage for over 30 years. During his career he was employed by the API as a content specialist in the development of a tank cleaning training program which is now being used worldwide. The program was developed due to a growing concern over the number of serious accidents occurring in the area of tank cleaning. Mr. Broussard explained that after the task force published initial guidelines, they were put through a consensus testing throughout the industry. After two years and several revisions, Rule 2015 was unanimously adopted by all the members of the API committee on safety and fire protection. The guidelines were particularly aimed at the tank owner, but were also geared to the relationship between the owner and the contractor and the things that they together should do to make this a safe job.
In his opinion, Mr. Broussard believed that the responsibility for deciding what methods and safety precautions were to be taken during any tank cleaning operations was a joint responsibility of the tank owner and the contractor.
Mr. Broussard explained that, according to industry standards, a tank owner is responsible for ensuring that a tank is below accepted flammable limits before anyone enters. Many companies use a permit system which requires the contractor, before entering a tank, to obtain a permit from the company certifying that the tank is below flammable limits. It is permissible for the owner to delegate this responsibility to the contractor, however, the owner should provide clear written guidelines on what is required before anyone may enter the tank. In addition to ensuring a safe environment for contractors to work in, a tank owner should also have specific rules and regulations covering all maintenance work of this nature, as well as a system of monitoring such work.
The second tank cleaning expert to testify on behalf of the plaintiffs was Mr. Ken Jost. Mr. Jost was also instrumental in the research and writing of Rule 2015 of the API publication on Cleaning Petroleum Storage Tanks. He pointed out to the court that although tank cleaning is a high risk operation, it is also a dirty job which does not attract sophisticated workmen. The combination of these factors often leads to unfortunate accidents. It was this problem which the API sought to address when it revised Rule 2015 and complemented it with a training program specifically addressed to tank owners and managers. As detailed in footnote 1 to the rule, Rule 2015 stresses the importance of a well organized and maintained system of responsibility for tank entry and cleaning policies, and it further stresses that if the work is done by a contractor a company representative should ensure that the contractor understands the correct procedures to be followed. Mr. Jost went on to emphasize that *514 all the associations[3] which have publications on entry into a confined space advocate this approach.
Petro's expert in tank cleaning, Mr. Dennis Howard, testified that Petro acted reasonably in hiring Serv-Tech and in assuming that Serv-Tech would follow proper safety procedures during the tank cleaning operation. However, he also agreed that it was unreasonable for Petro not to have anyone in its employ who understood the proper methods of tank cleaning. When asked if Petro should have done anything beyond what they did he stated:
A I would have preferred to see them go through the procedures with Serv-Tech to review that.
Q To take some steps to make sure in their own minds specifically that Serv-Tech knew how to safely clean the tank?
A Yes, I think that would have been something else that could have been done.
. . . . .
Q No, Sir. How do you think that PetroUnited should have made sure that the tank was being properly cleaned from a safety point of view?
A That at least some discussion in advance of the work took place that these were going to be the expected ways in which the work was to be performed, that the Occupational Safety and Health Act standards on tank entry in confined space should be followed.
. . . . .
Q Let's assume that Mr. Azwell said the question of safety never came up. Would you conclude thenif we assume that the question of safety never came up, I take it you would think that would be wrong?
A In my opinion yes.
Q It should very definitely have been discussed, shouldn't it?
A Yes.
Q If PetroUnited was going to delegate the responsibility for safety to Serv-Tech or any other contractor, there should have been some very specific agreements in effect, shouldn't there?
A I would say so, yes.
Q You would prefer to see any such agreements or contracts actually spelled out in writing in black and white?
A Well, they aren't spelled out in many places, but I would prefer that, yes.
Q And you would also prefer that the parties to that contract with that specific written contract on safety would go over that contract in detail to assure each other that each understood their respective responsibilities?
A Yes.
Q None of that occurred in this case, did it?
A No.
He also agreed that the API rule urging each company to organize and maintain a system for tank entry and cleaning was a good standard to apply.
Petro's second expert, Mr. Manuel Rodriguez, testified that it was normal industry practice to hire a contractor to clean a tank without any discussion of how the job was to be performed or any supervision over the job. He further testified that the API guidelines did not apply to Petro because Serv-Tech was a proven tank cleaner.
Mr. Ralph Zedlitz, Petro's superintendent of operations and plant manager, testified that he was not familiar with the API guidelines and had not attended a seminar where tank cleaning procedures were discussed. He stated that he expected Mr. Azwell, Petro's assistant terminal manager, to select an experienced tank cleaning contractor and to discuss with the contractor the method by which the tank was to be cleaned, and to approve those methods. During his testimony he explained that he anticipated that Serv-Tech's men would enter the tank and squeegee up the surface but he did not anticipate that they would bring lights into the tank. He stated that Petro never used light fixtures in an explosive atmosphere due to the danger involved. When questioned about Petro's regulations, concerning entry into confined *515 areas, Mr. Zedlitz stated that Petro requires that the atmosphere be tested and that once the atmosphere is below flammable limits that at least two people go in the tank using fresh air equipment and life lines. He went on to state that these rules do not apply to a contractor's employees. He further stated that he did not specify how the toluene was to be removed but he did not see anything wrong with the way that Serv-Tech cleaned the tank. His testimony also revealed that Petro had a fire-watch on duty during the cleaning of the tank to watch for blatant violations such as smoking behind the fire wall. Fire extinguishers and fire monitors were also available in case of an emergency.
Roger Bourgoyne, Serv-Tech's project supervisor, testified that he was not told what was in the tank. He also stated that he had worked at other plants such as Exxon and Dupont and that prior to letting the contractor's men in the tank the tank owner would test the atmosphere. He also testified that no safety harness or any other safety equipment was at the Petro job site.
Based on the foregoing, we conclude that the activity of cleaning a highly explosive chemical in a confined area is inherently and intrinsically dangerous. We further find that the unsafe methods used by Serv-Tech were impliedly authorized by Petro by their failure to provide any guidelines on tank entry and cleaning, their failure to discuss and approve the methods used by Serv-Tech, and their failure to monitor the activities of Serv-Tech. We find Petro equally at fault with Serv-Tech and accordingly amend that portion of the trial court's judgment.

EFFECT OF EMPLOYER'S NEGLIGENCE
The next issue to be considered is the effect, if any, of an employer's (Serv-Tech) negligence upon an employee's recovery from a negligent third party tortfeasor (Petro).
The plaintiffs contends that the trial court erred in reducing their award by the fault of Serv-Tech, relying primarily on Franklin v. Oilfield Heavy Haulers, 478 So.2d 549 (La.App. 3d Cir.1985), writs denied, 481 So.2d 1330, 1331 (La.1986).
In Franklin the trial court found an injured employee free from fault, but concluded that his employer was at fault. Accordingly, the court reduced the award to the plaintiff by the percentage of fault of his employer. The court of appeal amended that portion of the judgment stating that:
We are of the opinion that the trial judge erred in considering Cliff's [employer] negligence. Because it paid worker's compensation benefits to Franklin, Cliff's is immune from all tort liability. We believe that allowing the apportionment of fault to include the negligence of an employer (by way of reduction of the plaintiff's recovery) erodes the system. Therefore, the judge should have held the two defendants before the court liable for the full amount of plaintiff's damages. Cliff's negligence, if in fact, there was any, is immaterial under the circumstances.
Franklin, supra at 557.
The plaintiffs also point out the recent case of Senez v. Grumman Flxible Corp., 518 So.2d 574 (La.App. 4th Cir.1987), writs denied, 521 So.2d 1151 (La.1988), wherein the court relied on Franklin in affirming the trial court's refusal to reduce the plaintiff's award by the amount of fault attributed to his employer (NOPSI).
We also note similar results in Eskine v. Regional Transit Authority, 531 So.2d 1159 (La.App. 4th Cir.1988),[4]Trosclair v. Terrebonne Parish School Board, 489 So. 2d 1293 (La.App. 1st Cir.), writs denied, 493 So.2d 644, 493 So.2d 647, 493 So.2d 649 (La.1986)[5], and Marzula, supra.[6]
*516 The defendant argues that the trial court correctly reduced the plaintiffs' award by the fault of Serv-Tech based on the solidary liability imposed by LSA-C.C. art. 2324,[7] before its 1987 amendment. We disagree.
The Louisiana Compensation Law expressly provides an injured employee the right to proceed against a third-party tortfeasor and still maintain a worker's compensation action against his employer. LSA-R.S. 23:1101.[8] This suit against a third party is a tort action governed by negligence principles.
The solidary liability described in LSA-C. C. art. 2324, however, contemplates a common liability in tort. Under the clear provisions of the Louisiana Compensation Law an employer's liability is imposed, as well as limited, by the express provisions of the Worker's Compensation Law. The law is characterized as a compromise between employer and employee, wherein the employer gives up a determination that he was not at fault in a job-related accident, and the injured employee forfeits his right to seek a tort damage award, receiving only his wages and expenses. On the other hand, the liability of a third-party tortfeasor rests strictly on principles of negligence. Therefore, because the worker's compensation employer and the third party are not under a common liability to an injured employee the negligence principles expressed in LSA-C.C. art. 2324 do not apply in this situation. As we explained in Maryland v. Fabco, Inc., 438 So.2d 1152 (La.App. 1st Cir.1983), with regard to LSA-C.C. art. 2315, it is legally impossible for an employer and third party to be joint tortfeasors. See also Cripe v. Haynes, 350 So.2d 956 (La.App. 2d Cir.1977).
Although the apparent unfairness of this rule is no more evident than under the facts of the present case, we are without authority to fashion a different remedy in the face of clear legislative mandate. Any modification of the existing scheme must be done by the legislature.
We are however encouraged by the recent *517 amendment to LSA-C.C. art. 2324,[9] which now provides in pertinent part that:
[T]he liability for damages caused by two or more persons shall be a joint, divisible obligation, and a joint tortfeasor shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death, or loss, regardless of such other person's insolvency, ability to pay, degree of fault, or immunity by statute or otherwise. (Emphasis added.)
Based on the foregoing we are compelled to reverse that portion of the trial court judgment reducing the plaintiffs' award by the fault of their employer, Serv-Tech.

REIMBURSEMENT OF COMPENSATION INSURER FROM GENERAL DAMAGE AWARD
The next issue presented for review is whether a compensation insurer, intervening in an injured employee's third party suit, may recover compensation benefits paid from sums awarded the employee or survivor for damages other than medical expenses and lost earnings. The trial court awarded the intervening compensation insurer full reimbursement of benefits paid from the plaintiffs' total award, notwithstanding the fact that a portion of the awards were for pain and suffering. This issue was recently addressed by the Supreme Court in Brooks v. Chicola, 514 So.2d 7 (La.1987), wherein the court held that an intervenor's claim for reimbursement and its request for a credit are both limited to the amounts recovered in the tort judgment for medical expenses and lost income, and no reimbursement or credit may be taken against that portion of the award which is attributed to damages for pain and suffering. Accordingly, we reverse that portion of the judgment permitting United to be reimbursed from any portion of plaintiffs' awards except that portion awarded for loss of income and medical expenses.

DAMAGES

George Thompson
George Thompson contends the trial court award of $25,000 for his pain and suffering was inadequate.
Before a trial court award may be questioned as inadequate or excessive, the reviewing court must look first, not to prior awards, but to the individual circumstances of the present case. Thus the initial inquiry must always be directed at whether the trial court's award for the particular injuries and their effects upon this particular injured person is a clear abuse of the trier of fact's "much discretion" under LSA-C.C. art. 1934(3). Only after such determination of abuse has been reached is a resort to prior awards proper for purposes of then determining what would be an appropriate award for the present case. Reck v. Stevens, 373 So.2d 498 (La.1979).
Upon finding an abuse of discretion, the award can only be raised (lowered) to the lowest (highest) point which is reasonably within the discretion of the trial court. Coco v. Winston Industries, Inc., 341 So. 2d 332 (La.1976).
When the tank ignited, Thompson was completely engulfed in flames as he was literally blown out of the tank through an open manway cover. Thompson landed in a puddle of water outside the tank, but the flames continued to spread on his body. Ervin Hillard managed to put out the flames, but not until after Thompson's slicker suit was burned completely off of him. He was wrapped in a sheet and taken to Our Lady Of The Lake Regional Medical Center. He was later transferred to the Baton Rouge General Burn Unit.
The Baton Rouge General Hospital records verify that Thompson remained in *518 the Burn Unit for over one month from December 9, 1982 to January 12, 1983. Dr. D.V. Cacioppo assumed primary responsibility for his care while in the hospital. Dr. Cacioppo's deposition was introduced at trial and he testified that Thompson was alert when he arrived at the hospital, but in severe pain. The patient presented himself with burns over 45% of his body. Approximately 20% of his body suffered second degree burns, while 25% suffered third degree burns. Thompson was listed as "critically injured." There was no evidence of any injuries other than the burns, and his burns were as follows, second degree burns of the left elbow and forearm, second degree burns of the anterior thigh and upper leg, second and third degree burns of both buttocks, third degree burns of the entire posterior chest wall, third degree burns of the posterior aspect of both thighs, both forearms, left popliteal area, and posterior left leg.
The doctor further testified that Thompson suffered loss of body fluids from the tissue burned beneath the skin. The burns were debrided and he was placed in intensive care. During his entire hospital stay, Thompson was bathed twice daily in a solution of water and chlorine. The old bandages were replaced and the dead skin debrided. Dr. Cacioppo described these baths as being very traumatic.
Thompson also endured three major skin graft operations. A total of 25% of his body was grafted. Dr. Cacioppo emphasized the fact that Thompson's life was in danger from the time he entered the hospital until the skin grafts were completed.
Although the hospital did its best to control Thompson's pain, Dr. Cacioppo testified that it was impossible to completely eliminate the pain. The doctor testified that burns are one of the most painful injuries one can endure and that pain can last a very long time.
Thompson was discharged from the hospital on January 12, 1983 and was required to wear a jobst garment until August, 1983. Dr. Cacioppo assigned a 15% to 20% permanent disability rating to Thompson. Although the doctor felt that he could return to some type of work, he did not feel that he could return to the same type or manner of work he was performing at the time of the accident.
Thompson was also treated by Dr. Leo Farmer, whose deposition was also introduced. Dr. Farmer was also of the opinion that Thompson's physical activities would be limited and that he should not return to heavy physical labor which might expose him to heat and light.
We find that the trial court abused its discretion in awarding only $25,000 in general damages to Thompson. A review of similar awards indicates that the lowest amount which reasonably may have been awarded is $50,000. We accordingly amend the trial court judgment to award George Thompson $50,000 in general damages.
Thompson also contends the trial court's award of $34,020 for his loss of future wages was inadequate.
Awards for loss of future income are inherently speculative and are intrinsically insusceptible of being calculated with mathematical certainty. Thus, the court must exercise sound judicial discretion in determining these awards and render awards which are consistent with the record and which do not work an injustice on either party. A loss of future income award is not merely predicated upon the difference between a plaintiff's earnings before and after a disabling injury. Such an award is predicated upon the difference between a plaintiff's earning capacity before and after a disabling injury. Loss of future income awards thus encompass the loss of a plaintiff's earning potentialthe loss or reduction of a person's capability to do that for which he is equipped by nature, training, and experience and for which he may receive recompense. Smith v. Porche Brothers Lumber and Supply, Inc., 491 So.2d 412 (La.App. 1st Cir.1986).
Plaintiffs' expert economist, Dr. William P. Culbertson, calculated Thompson's loss of earning capacity as the difference between what Thompson would have earned based on his wage scale prior to the accident *519 and what Thompson would earn thereafter based on minimum wage. This calculated out to $61,460.
The trial court's reasons on quantum indicate that it accepted Culbertson's calculation of what Thompson would have made based on his pre-accident pay. However, the trial court only awarded Thompson 20% of this amount based on the medical testimony indicating a 20% physical disability on Thompson's part.
Dr. Cornelius Gorman, a vocational rehabilitationist, evaluated Thompson after the accident and classified him as "one who would work at the minimum wage or slightly above."
Dr. Cacioppo saw no real restrictions on Thompson returning to work, other than to avoid the exposure to high temperatures associated with work in tanks.
In addition, as pointed out by Petro in brief, the record reflects that Thompson's actual earnings in the several years preceding the accident were substantially less than in 1982. Furthermore, Dr. Culbertson's testimony, even though uncontradicted, indicates that too many variables are involved in such a determination. Where the trier of fact has made a "reasonable assessment" based on the evidence, the award should not be disturbed on appeal. See Burton v. Foret, 498 So.2d 706 (La. 1986). Accordingly, we find no abuse of discretion in Thompson's award for loss of future wages, and affirm that portion of the trial court's judgment.

Ervin Hillard
Ervin Hillard contends the trial court award of $25,000 for his pain and suffering, and mental anguish, was inadequate.
The medical testimony reflects that Ervin Hillard suffered a herniated lumbar disc as a result of the explosion, which required two major back operations. Dr. Anthony Ioppolo, the neurosurgeon who last operated on Ervin Hillard, assigned a probable, permanent physical disability to Hillard of 15% to 20%.
Dr. Louis Cenac, a psychiatrist, also testified extensively as to Ervin Hillard's mental condition. He diagnosed Hillard as suffering from a severe case of post traumatic stress disorder, basically resulting from Ervin's witnessing the violent death of his brother Elvin, and his feeling of guilt in not being able to rescue him.
Although we are convinced as to the severity of Ervin Hillard's mental disorder, Louisiana jurisprudence is settled to the effect that a person may not recover for the mental anguish which he suffered as a result of the injury or death of another person. See Worsham v. Walker, 498 So. 2d 260 (La.App. 1st Cir.1986), writ denied, 500 So.2d 423 (La.1987); Bourg v. Redden, 351 So.2d 1300 (La.App. 1st Cir.1977). In addition, a surviving brother or sister may only assert a claim for damages which they sustained as a result of the sibling's death "if he left no spouse, child or parent surviving." Former LSA-C.C. art. 2315 (now LSA-C.C. art. 2315.2). Therefore, Ervin Hillard can only recover for those damages that he received as a direct result of the explosion in addition to his back injury.
On redirect examination in his deposition, Dr. Cenac did state that Ervin Hillard "was made passive by the force of the blast." However, Dr. Cenac was unable to assign any percentage as to how much this contributed to the post traumatic stress disorder. Our review of the evidence leads us to conclude that Ervin Hillard's post traumatic stress disorder resulted solely from Ervin witnessing his brother's death.
Even based on this conclusion, however, we find that the award of $25,000 was inadequate for the pain and suffering resulting from the back injury, and whatever mental anguish, or fear, he may have suffered as a result of his being physically injured in the blast. The lowest amount of general damages which could reasonably have been awarded to Ervin Hillard for his injuries is $50,000. We accordingly amend that portion of the trial court's judgment to award Ervin Hillard $50,000 in general damages.
Ervin Hillard also contends the trial court award of $34,000 for his loss of future wages was inadequate.
*520 Plaintiffs' counsel claims the trial court erred in reducing the total amount of his expected future earnings, as calculated by Dr. Culbertson, since "there can be no doubt that Ervin is totally and permanently disabled."
We disagree. Ervin Hillard's alleged total disability is a result of his post traumatic stress disorder, which is not a compensable injury. Accordingly, any loss of future wages resulting therefrom is also non-compensable. Therefore, the trial court was correct in awarding lost future wages based only upon Ervin Hillard's back injury and resulting physical disability. We affirm.

Rosie Hillard
Rosie Hillard contends the trial court award of $25,000 for her loss of love and affection due to the death of her husband was inadequate.
The record does not establish in any detail that a close and loving relationship existed, other than Rosie Hillard's statement that it was "lovely." The trial court apparently was not convinced that Rosie Hillard had established by a preponderance of the evidence that a higher award was appropriate. We cannot say the trial court abused its discretion as to this element of damages and accordingly affirm. cf. Daigle v. Hanson, 476 So.2d 953 (La.App. 1st Cir.1985).
Rosie Hillard also contends the trial court erred in reducing Elvin Hillard's estimated loss of future wages by 50% in arriving at the amount awarded for her loss of support as a result of his death. Since the trial court's reasons for judgment are silent, she presumes the trial court "concluded that fifty percent of the lost wages would be consumed by the decedent." She contends this was error since the record is totally devoid of any evidence of the decedent's personal consumption. She argues that because the defendant failed to put on some affirmative evidence of the decedent's personal consumption, she was entitled to recover the full amount of Elvin Hillard's lost wages.
We disagree. A plaintiff bears the burden of establishing each and every element of damage claimed. Woodfield v. Dugas, 450 So.2d 1011, 1013 (La.App. 1st Cir.1984). A plaintiff must show prior actual support in order to be compensated for its loss. McQuarters v. Zegar, 466 So.2d 579 (La. App. 5th Cir.1985).
In Blanchard v. Rodrigue, 340 So.2d 1001, 1005 (La.App. 1st Cir.1976), writs denied, 341 So.2d 1129, 341 So.2d 1130 (La. 1977), this court said:
Factors which should be weighed in determining the amount due for loss of support include the decedent's present earnings, his age and life expectancy, his work-life expectancy, the possibility of a decrease or increase in his earnings, the decedent's job security, the nature of decedent's work, his health, his relationship with his family, his personal expenses and his past work record. Other factors are the surviving spouse's age and health, the minor children's age, and the effects of inflation and the need to discount future earnings to a present day amount. In short, all factors relevant to a determination of the amount of the loss of support due to the premature demise of the decedent should be considered. (Emphasis added.)
Rosie Hillard presented no evidence establishing the extent of decedent's personal expenses, nor any evidence of what amount of his wages were spent on her support. In this factual posture, we are unable to say that any amount awarded for loss of support is inadequate.[10] We affirm that portion of the trial court's award.
Finally, Rosie Hillard contends the trial court's award of $15,000 for her husband's pain and suffering prior to his death was so inadequate as to constitute an abuse of discretion. We agree.
Dr. James Freeman, the Deputy Coroner of Iberville Parish, performed the autopsy *521 on Elvin Hillard. Dr. Freeman testified that in most cases of death caused by fire, the immediate cause of death is carbon monoxide poisoning which results in asphyxiation. However, Elvin Hillard had an oxygen mask with an air hose that extended out of the tank to a bottle of oxygen. Dr. Freeman's autopsy showed only a normal amount of carbon monoxide in his body. This finding, coupled with the external oxygen source, led Dr. Freeman to conclude that Elvin Hillard "literally burned to death", a process which could have taken several minutes.[11]
We conclude that the lowest amount which could reasonably have been awarded Rosie Hillard for Elvin Hillard's pain and suffering is $50,000. We therefore amend that portion of the trial court's judgment and award Rosie Hillard $50,000 for her husband's pain and suffering prior to his death.
In accordance with the views expressed herein, we reverse in part, amend in part and affirm as amended.
REVERSED IN PART, AMENDED IN PART, AND AFFIRMED AS AMENDED.
NOTES
[1] Ervin Hillard testified that the men were not told what was inside the tank nor of its propensity for explosion. He further stated that had they been told that the chemical was highly explosive they would have taken additional precautions such as checking the soles of their shoes for stones which may have cause sparks within the tank.
[2] The trial court found that Appleton was 33 1/3% negligent "based on the proposition that [the] light was not adequately marked with adequate warnings under the conditions and circumstances of its use at [the] time."
[3] American National Standards Institute and NIOSH.
[4] In Eskine the court relied on Franklin, supra in reversing the trial court's decision to reduce the plaintiff employee's award by the amount of fault attributed to his employer.
[5] In Trosclair we held that the trial court erred in failing to assign fault to the plaintiffs (survivors of deceased employee), and deceased's employer in a bus/tractor collision. The judgment was amended, finding the plaintiffs 40% at fault, the employer 10% at fault and the defendant 50% at fault. We thereafter concluded that the defendants were solidarily liable for 60% of the damages.
[6] In Marzula an employee of a general contractor brought suit against the excavating sub-contractor for injuries resulting from a cave-in of the excavation. The court of appeal found the employer 70% at fault, the sub-contractor 30% at fault and no fault on the part of the employee. The court concluded, without reasons, that the doctrine of comparative fault did not apply and held the defendant liable to the plaintiff for 100% of the damages.
[7] LSA-C.C. art. 2324 provided prior to its amendment as follows:

He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act.
Persons whose concurring fault has caused injury, death or loss to another are also answerable, in solido; provided, however, when the amount of recovery has been reduced in accordance with the preceding article, a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of negligence has been attributed, reserving to all parties their respective rights of indemnity and contribution.
[8] At the time of this suit LSA-R.S. 23:1101 read as follows:

When an injury or compensable sickness or disease for which compensation is payable under this Chapter has occurred under circumstances creating in some person (in this Section referred to as third person) other than those persons against whom the said employee's rights and remedies are limited in Section 1032 of this Chapter, a legal liability to pay damages in respect thereto, the aforesaid employee or his dependents may claim compensation under this Chapter and the payment or award of compensation hereunder shall not affect the claim or right of action of the said employee or his dependents, relations, or personal representatives against such third person, nor be regarded as establishing a measure of damages for the claim; and such employee or his dependents, relations, or personal representatives may obtain damages from or proceed at law against such third person to recover damages for the injury, or compensable sickness or disease.
Any person having paid or having become obligated to pay compensation under the provisions of this Chapter may bring suit against such third person to recover any amount which he has paid or become obligated to pay as compensation to such employee or his dependents.
[9] We also note that LSA-R.S. 23:1101 has recently been amended to provide that "where the recovery of the employee is decreased as a result of comparative negligence, the recovery of the person who has paid compensation or has become obligated to pay compensation shall be reduced by the same percentage." However, the legislature, as yet, has not acted to provide for a reduction of the employer's compensation recovery when the employer is either personally or vicariously at fault.
[10] We need not address whether the trial court erred in providing its own factor of 50%, presumably as decedent's personal consumption factor, since defendants do not appeal this judgment.
[11] Defendant's argue in brief that the presence of a skull fracture leads to the conclusion that Elvin Hillard was knocked unconscious by a metal beam which fell on him. However, the award by the trial court reflects that it accepted Elvin Hillard's testimony that his brother cried out for help during the fire. Such a conclusion is also supported by Dr. Freeman's testimony that "blowout skull fractures" often result from expansion of brain matter, its surrounding fluids and the skull itself in fires and incinerations.