486 So.2d 798 (1986)
Betty Thornton SMITH, et al.
v.
Crown ZELLERBACH, et al.
No. 84-CA-1045.
Court of Appeal of Louisiana, First Circuit.
March 25, 1986.
Writ Denied June 6, 1986.
*800 Glenn P. Marcel, Baton Rouge, for plaintiffs-appellees Betty Thornton Smith, et al.
William A. Norfolk, Baton Rouge, for defendants-appellants Crown Zellerbach Corp. and Nat. Union Fire Ins. Co. of Pittsburgh.
Richard G. Creed, Jr., Baton Rouge, for intervenor-appellee Chicago Bridge and Iron Co.
Boris F. Navratil, Baton Rouge, for defendants-appellants Kamyr Installations, Inc. and Fireman's Ins. Co. of Newark, N.J.
Before EDWARDS, LANIER and J.S. COVINGTON, JJ.
EDWARDS, Judge.
This is a wrongful death case brought by the surviving spouse and two sons of Ernest Smith. The deceased was employed by Chicago Bridge & Iron Co. (Chicago, CBI) on June 4, 1979, when a twenty-foot piece of angle iron fell and struck him in the head. Smith was working as a painter at the Crown Zellerbach (CZ or Crown) paper mill in Bogalusa, Louisiana, on part of Crown's mill modernization.
CZ had contracted with Kamyr, Inc. for the design, fabrication, and painting of two high density tanks and a diffusion washer which were part of a new brown stock washing system. Kamyr, Inc. then subcontracted the fabrication and painting of the tanks and washer to Chicago Bridge & Iron Company. Crown contracted with Kamyr Installations, Inc. (referred to herein as Installations) a wholly-owned subsidiary of Kamyr, Inc., to install the new equipment in the Bogalusa mill. That contract called for Installations to provide all of the labor and supervision necessary to do the work. Installations in turn subcontracted part of the erection and painting to Chicago. Ernest Smith was killed while he was working in the erection phase of the construction. Plaintiffs sued Crown, Installations, and their respective insurers. Crown filed a third party action against Installations and Kamyr, Inc. for contractual indemnity. Then Chicago intervened, seeking reimbursement for workmen's compensation benefits paid to Smith's widow.
The parties agreed that the indemnity claim of CZ against Installations would be tried by the court alone, after the jury trial, and that the workmen's compensation intervention would likewise be tried by the court.
This case was heard in late February and early March of 1984. The jury answered approximately 36 special interrogatories and held CZ and Installations liable. The court found for Chicago on its intervention. Crown voluntarily dismissed its indemnity claim against Installations and Kamyr, Inc.
The jury awarded Mrs. Smith a total of $599,000.00 and each of the two surviving sons $50,000.00. Both Crown and Installations filed motions for judgment notwithstanding the verdict and for new trial, all of which were denied. Crown and Installations now bring this suspensive appeal.

CHICAGO BRIDGE & IRON COMPANY
At the time of his death, Ernest Smith was an employee of CBI, working as foreman of a painting crew. He had approximately twenty years' experience in the construction business. Testimony at trial clearly established certain facts: (1) a piece of structural steel was being lifted over the heads of the workers below, without any warning having been given; (2) the piece of metal, or angle iron, was not properly secured *801 for lifting; (3) as a result, the angle iron slipped loose and fell, striking Ernest Smith in the head and killing him; (4) all of this was due to negligence on the part of Chicago Bridge & Iron Company.
The jury properly found Chicago's employees guilty of that fault which was the proximate cause of the accident. They made this finding, even though Chicago was not sued by plaintiffs and was only in the case as an intervenor. We affirm this part of the verdict because it is fully supported by the evidence.

CROWN ZELLERBACH
The law is well established in Louisiana that a principal is not liable for the torts of an independent contractor and that the only legal basis for imposing vicarious liability in the workplace is that which is established by Article 2320 of the Louisiana Civil Code. This article makes employers answerable for the damage occasioned by their "servants and overseers, in the exercise of the functions in which they are employed." Thus the independent contractor would be responsible for damages done by its own employees.
Crown took the position that it had hired an independent contractor who in turn subcontracted the erection work. The jury found this to be true, but then found also that Crown had reserved the right to supervise the work and that it actually had assumed control. The question before this court, therefore, is whether or not CZ actually reserved the right of supervision.
It is now accepted law that the relationship of principal and independent contractor exists when the following conditions are met:
1. There is a valid contract between the parties;
2. The work being done is of an independent nature such that the contractor may employ non-exclusive means in accomplishing it;
3. The contract calls for specific piecework as a unit to be done according to the independent contractor's own methods without being subject to the control and direction of the principal, except as to the result of the services to be rendered;
4. There is a specific price for the overall undertaking; and
5. Specific time or duration is agreed upon and not subject to termination at the will of either side without liability for breach.
Hickman v. Southern Pacific Transport Company, 262 La.102, 262 So.2d 385 (1972); Amyx v. Henry & Hall, 227 La.364, 79 So.2d 483 (1955). See also Poynor v. Cure, 443 So.2d 1151 (La.App. 5th Cir.1983), writ denied, 446 So.2d 1225 (La.1984).
The most important inquiry to be made therefore, is whether the right to control the work is reserved by the principal. In applying this test it is not the supervision and control which is actually exercised that is significant; rather, it is the right to exercise it which is of primary concern. Hickman v. Southern Pacific Transport Company, supra.
The contract between Crown Zellerbach and Kamyr Installations, Inc. required Installations to supply all labor, supervision, tools, equipment and expendables to perform all of the work on installing the brown stock washing system. Further, it expressly provided that Installations was to be an independent contractor and not an agent or employee of Crown. Nowhere in the contract was there a reservation of control over the means used to complete the job. In fact, the contract specifically called for Installations to supervise the work. Finally, the contract provided a specific price for the overall undertaking and said that termination by either party would subject that party to liability for breach. It is plain, therefore, that all the elements of the Hickman test are present in this case.
The record verifies this by showing that Chicago Bridge and Iron Company actually operated as an independent contractor. *802 The CBI foremen got their work instructions from their employer's Houston office, not from Crown. Chicago instructed its own employees on safety and the procedure for securing loads being lifted: they decided how the load was to be rigged, how the crane would be operated, and how signals would be given to workmen on the ground. Furthermore, they scheduled their own work, coordinating the erection crews with the painting crews. It was they who made the decision allowing the painters to work in the same area in which overhead lifts were being made.
It is clear, therefore, that the jury's finding that Crown reserved the right to supervise the work, and actually assumed control over this job, is unsupported by the evidence and thus is clearly wrong. This conclusion is inherently inconsistent with the finding that Crown hired an independent contractor.
Plaintiffs argue that CZ "intermeddled" in the activities of the subcontractors, offering this as proof that Crown actually took over control of the job. For instance, the record does show that Crown controlled who could work in its mill, told the contractors where to work, and required compliance with all applicable safety codes and the mill's safety regulations, such as speed limits in the plant, etc. However, this is not the kind of "control" referred to in Hickman, supra. The test for determining owner-independent contractor status is direct supervision over the step-by-step process of accomplishing the work. The record shows no evidence that CZ either retained this authority or exercised it.
Plaintiffs assert that Crown is still liable, however, because the work was inherently dangerous. The doctrine relied upon was stated by this court in Ewell v. Petro Processors of Louisiana, Inc., 364 So.2d 604, 606 (La.App. 1st Cir.1978), writ denied, 366 So.2d 575 (La.1979):
Ordinarily, an employer is not liable for offenses of an independent contractor committed in the course of performing his duties under the contract. An important exception to this rule, which has been recognized in this state, is that if the work is inherently or intrinsically dangerous unless proper precautions are taken to avoid injury, the employer cannot avoid liability by letting the work out to an independent contractor. Montgomery v. Gulf Refining Co., 168 La.73, 121 So. 578 (1929).
The critical inquiry in determining whether an activity is "inherently or intrinsically dangerous," and therefore non-delegable, is whether it can be made safe when it is performed in a proper and workmanlike manner. Evidence presented at trial established that the work could have been done safely. Both Mr. Vaughn and Dr. Miller, testifying as plaintiffs' experts, said this was so. See also Stoute v. Mobil Oil Corporation, 297 So.2d 276 (La.App. 3rd Cir.1974), writ denied, 300 So.2d 839 (La. 1974) and Stine v. Creel, 417 So.2d 1243 (La.1st Cir.1982), writ denied, 422 So.2d 163 (La.1982), in which the court stated that plaintiff was not injured by an extra hazardous instrumentality but by the improper use of a non-hazardous instrumentality.
We cannot agree with the jury's finding that the work was inherently dangerous. This was routine construction work which is done safely everyday. The accident resulted from an improperly rigged load and the failure to warn, on this particular occasion, that a lift was being made. Thus it was the manner of the lift that was dangerous, not the nature of the work. This finding of fact is clearly wrong.
Accordingly, we hold that the jury was correct in its finding that Crown hired an independent contractor who in turn subcontracted the erection work; this is supported by the evidence. We hold further that the jury was not correct in finding that Crown reserved and actually exercised the right of supervision; this is not supported by the evidence. We conclude, therefore, that Crown Zellerbach cannot be held liable for Smith's death. Consequently, that portion *803 of the judgment relating to Crown is reversed.

KAMYR INSTALLATIONS, INC.
When a principal undertakes to do work under a contract and in turn contracts with another for execution of part of that work, the principal is then considered the "statutory employer" of those working for the subcontractor. As such, the principal is liable to the subcontractor's employees for workmen's compensation only, and is immune from suits in tort. LSA-R.S. 23:1061 and 23:1032.
Kamyr Installations argues that it was the statutory employer of Ernest Smith at the time of his death, by virtue of a subcontract from Installations to CBI. The jury found as a fact that Installations was not Smith's statutory employer. Counsel for Installations sought to introduce proof of the subcontract with CBI, but the trial judge refused to allow the evidence to be presented. His refusal is now assigned as error on appeal.
The record shows that the trial judge disallowed the introduction of this evidence on the ground that it would "change the entire ball game." The court stated flatly that if the evidence showed that the painting Mr. Smith was doing was a part of the contract between Installations and CBI, Mr. Smith would indeed be a statutory employee of Installations and that it would be "unfair" to the plaintiffs to allow Installations to prove this. The reason given by the court was that it was the court's understanding that the only theory on which Installations could base its statutory employer defense was a joint venture theory, along with Kamyr, Inc., which had been advanced in an earlier motion for summary judgment.[1]
In its motion for summary judgment Installations did advance the argument that it and its parent company, Kamyr, Inc., were joint venturers on the Crown project. This was not, however, the only theory advanced. An alternative theory was that Mr. Smith was doing work under the Installations subcontract to CBI. The trial court later recognized this alternative theory in its written reasons for denying the summary judgment.
After reviewing the entire record, we conclude that the trial judge should have allowed counsel to argue his position to the jury and to introduce evidence in support of it. We say this because Installations actually advanced this particular defense from the very beginning of the lawsuit.
The first response of Installations to plaintiff's petition was an exception of no right or cause of action which stated that Ernest Smith was an employee of Chicago Bridge & Iron, and that "at the time of said accident and injuries Chicago Bridge & Iron Works was subcontracted to exceptor, Kamyr Installations, Inc." This defense was later asserted by Installations in its answer to the suit, and again in the pretrial order. Consequently, the trial court could not have been correct in its ruling that counsel had pleaded only a joint venture defense.
As a result of this incorrect ruling, Installations was forced to proffer certain testimony and documents in its effort to prove that it was Smith's statutory employer. A careful reading of the proffered material, some of which had already been introduced by plaintiffs, together with the rest of the admitted evidence, shows clear proof that Installations was indeed the statutory employer of Ernest Smith at the time of his death.
The chain of authorization consists, first, of four contracts introduced by plaintiffs:
 P-4  by which Crown contracted to purchase
 the vessels from Kamyr, Inc.;
 P-5  by which Kamyr, Inc. subcontracted
 the fabrication of the vessels to CBI;
 P-3  by which Crown contracted to have the
 vessels installed on its premises by
 Kamyr Installations; and
 P-6  by which Installations subcontracted to
 CBI the erection of the vessels on
 Crown's premises.
*804 None of these contracts originally contemplated that the vessels would be painted. However, on September 20, 1978, Revision No. 5 was made to contract P-4, which added painting at a cost of $53,600.00.
Although this painting addendum was made to the purchase contract, CBI made it clear from the start that it would not do all of the painting as a part of its fabrication subcontract but that it reserved the right to do it as a part of the field erection subcontract it had from Installations. CBI assigned No. 75235 to the fabrication (sub) contract it held from Kamyr, Inc.; it assigned No. 75236 to the erection (sub) contract it held from Installations. On August 11, 1978, Mr. W.A. Inman, CBFs contract engineer, addressed a letter to Kamyr in which he referred to both of the (sub) contracts and stated:
We reserve the option to carry out the cleaning and prime painting in the shop or in the field depending on the resources available at the time this work is to be carried out.
Ultimately, only $11,800 worth of painting was done by CBI in its shop pursuant to the fabrication contract it had from Kamyr, Inc. The balance of $41,800 was credited to Kamyr, Inc. under that contract. Thereafter this figure was added to the contract price for the field erection and charged to Installations under the subcontract it had awarded to CBI. All of this is clearly set out in the letter of November 26, 1979, by Mr. Scholbe, District Sales Manager of CBI, to Mr. Allard of Kamyr.
All of the documents referred to above are a part of plaintiff's exhibits although some of them had also been proffered by Installations. One document of considerable interest was telex No. 17 dated November 9, 1978, from Mr. Inman of CBI to Kamyr. Plaintiffs' counsel argued that Installations should not be allowed to introduce this telex into evidence because he was not told that it was part of the contract. However, this telex was part of the document package filed with the Court in response to the order that the parties exchange all documents which they intended to introduce into evidence. These documents were filed in the record on September 26, 1983, some 5 months before the trial. Further, CBI listed Telex 17 as its exhibit # 3 in the package of exhibits it exchanged with all parties in this litigation on October 17, 1983.
This telex, sent long before the accident occurred, sets forth clearly that the painting CBI would do in its fabrication shop would cover only the priming of Rings 4 through the top, while the blasting and priming of the bottom three rings (the work Mr. Smith was doing when he was killed) would be done in the field under the Installations-CBI contract.
The court refused to allow defendant to introduce this crucial piece of evidence. The Court further ruled that counsel for Installations could not show how Kamyr had arrived at a price for painting in the contract. The court said: "The contract will have to speak for itself as far as any painting is concerned." N. Baldwin, Vice President of Kamyr, Inc. testified:
Q. Did Kamyr Installations, Inc. subcontract work to anyone?
A. CBI.
Q. What work?
A. Field Painting
The court ordered this answer stricken from the record.
It is argued by plaintiffs that "paper work" done after Mr. Smith's death is not relevant to the issue of whose work he was doing. However, the proffered testimony of Tom Davis, CBI's contract engineer, was that, at the time of the accident, CBI and Installations fully understood that all field work including field painting was being done by CBI under CBI Contract 75236, i.e., the erection contract between CBI and Installations; and that the later "paper work" merely reflected this truth. He added that it is not at all unusual on projects of this nature for "paper work" to catch up later with what had actually been done earlier.
*805 It is plain from the evidence, therefore, that Ernest Smith was working as a statutory employee of Installations while in the service of CBI. Since this would give Installations immunity from the present suit by Smith's survivors, we conclude that the peremptory exception pleading the objection of no right of action filed by Installations should have been sustained by the trial court. Accordingly, we hereby sustain the exception and reverse the judgment against Kamyr Installations, Inc.
Costs of these proceedings are taxed to plaintiffs.
REVERSED.
NOTES
[1] The theory of the case doctrine has been abolished in Louisiana. LSA-C.C.P. arts. 862, 1154, and 2164. Carter's Ins. Agency, Inc. v. Franklin, 428 So.2d 808 (La.App. 1st Cir.1982).