652 So.2d 531 (1995)
Lawrence Edward DAVIS
v.
INSURANCE COMPANY OF NORTH AMERICA, et al.
No. 94 CA 0698.
Court of Appeal of Louisiana, First Circuit.
March 3, 1995.
Writ Denied May 5, 1995.
*533 Ralph Brewer, Baton Rouge, for plaintiffappellant, Lawrence E. Davis.
Daniel R. Atkinson, Jr., Baton Rouge, for intervenor-appellee, Commercial Union Ins. Co.
John Swanner, Baton Rouge, for defendant-appellee, Schneider National Bulk Carriers, Inc.
Before LOTTINGER, C.J., and SHORTESS and CARTER, JJ.
CARTER, Judge.
This is an appeal from a trial court judgment in a tort suit for damages.

FACTS
On or about Friday, February 13, 1987, Schneider National Bulk Carriers, Inc. (Schneider), a national transporting company, dropped off a tanker for cleaning at Independent Tank Cleaning Services, Inc. (Independent), a professional cleaning company in Baton Rouge. The tanker had three compartments and contained a hardened residue of a liquid substance known as ureaformaldehyde *534 resin, which had been manufactured by Cargill.[1] In performing its cleaning operations, Independent often utilized the services of temporary workers supplied by Temp-Timers, Inc. (Temp-Timers).
Prior to February, 1987, petitioner, Lawrence Edward Davis, was employed as a temporary maintenance worker by Temp-Timers. At approximately 10:00 p.m. on February 15, 1987, Davis received a telephone call from Independent to report to work. Davis arrived at Independent at approximately 1:00 a.m. on February 16, 1987, to assist with cleaning tankers.
Upon his arrival at Independent, Davis was assigned the task of manually scraping resin residue from within the Schneider tanker. Because Davis smelled fumes when he attempted to enter the tanker, he used a leaf blower to remove some of the vapor. Davis initiated the blower and commenced to utilize the blower. An explosion occurred, and Davis sustained serious burn injuries to his body.
On July 30, 1987, petitioner, Lawrence Edward Davis, filed a tort suit for personal injuries against Independent, its insurer Insurance Company of North America (INA), and Schneider, alleging that his injuries resulted from their fault. On September 11, 1987, Schneider filed an answer to Davis's petition, generally denying the allegations. Schneider also alleged that the sole, proximate, and legal cause of the accident giving rise to the lawsuit was the fault of Davis or the fault of a third party for whom Schneider was not responsible. Independent and INA thereafter filed an answer, generally denying the allegations of Davis's petition. Independent and INA also alleged that, because Independent was Davis's statutory employer, his exclusive remedy against Independent and INA was worker's compensation. Independent and INA alternatively alleged that Davis's injuries were caused by his own fault or by the fault of some third party.
On December 11, 1987, Commercial Union Insurance Company (Commercial Union), the worker's compensation insurer of Temp-Timers, filed a petition of intervention, seeking reimbursement for the worker's compensation and medical benefits paid to Davis.[2] Thereafter, various motions for summary judgment were filed. Schneider filed a motion for summary judgment. Independent and INA also filed a motion for summary judgment on the statutory employment defense. By judgment rendered on October 28, 1988, and signed on November 2, 1988, the trial court granted Independent's and INA's motion for summary judgment, finding that Independent was Davis's statutory employer, and dismissed Davis's claims against them.[3] Schneider subsequently filed a motion, reurging its motion for summary judgment and attaching several depositions to its motion for summary judgment.[4] After a hearing on February 17, 1989, the trial judge granted Schneider's motion for summary judgment and dismissed Davis's claims against Schneider at his cost. The judgment granting the motion for summary judgment was signed on February 23, 1989. Thereafter, Davis and Commercial Union appealed the dismissal of his action. This court, in an unpublished opinion dated May 30, 1990, under docket number 89 CA 0709, 562 So.2d 478, reversed the trial court judgment granting *535 the motion for summary judgment and remanded the matter to the trial court for further proceedings.
After a trial on the merits, the trial court rendered judgment in favor of Schneider and against Davis, dismissing Davis's demands, with prejudice, at his costs. The trial court judgment was signed on September 30, 1993. From this adverse judgment, Davis[5] appeals, raising the following issues:
1. Under the circumstances of this case can Schneider avoid liability for the activity of cleaning out two highly explosive or hazardous substances from a confined area by contracting that work out to an independent contractor which had to use another highly flammable cleaning substance to complete the job?
2. Did Schneider owe duties to Independent's midnight tank car cleaning personnel to inform them of what kind of load remains Schneider had been carrying and what kind of danger they might face in trying to clean out the tank car remains; to warn them not to use any kind of equipment in the inside of a tank car that might give off a spark to ignite possible fumes from the tank car load remains which might in turn cause an explosion or fire; and not to make the work of cleaning workers harder by leaving the tank car doors open causing the load remains to harden?
3. Did Davis prove he is entitled to money damages?

LIABILITY OF SCHNEIDER
Davis contends that Schneider is absolutely liable as an enterpriser engaged in an ultrahazardous activity. Davis further urges that Schneider was negligent for failing to take reasonable measures to protect against the risk that a worker cleaning its tanker may be injured by the residue of the flammable product transported in its tanker and for delivering the tanker with its dome lids open.

A. LIABILITY FOR ACTS OF CONTRACTOR
Under Louisiana law, as a general matter, a principal is not liable for the offenses an independent contractor commits in the course of performing its contractual duties. Ainsworth v. Shell Offshore, Inc., 829 F.2d 548, 549 (5th Cir.1987), cert. denied, 485 U.S. 1034, 108 S.Ct. 1593, 99 L.Ed.2d 908 (1988); Hawkins v. Evans Cooperage Co., Inc., 766 F.2d 904, 906 (5th Cir.1985); Bergeron v. Blake Drilling & Workover Company, Inc., 599 So.2d 827, 838 (La.App. 1st Cir.), writs denied, 605 So.2d 1117 and 1119 (La.1992); Triplette v. Exxon Corporation, 554 So.2d 1361, 1362 (La.App. 1st Cir. 1989); Thompson v. Petro United Terminals, Inc., 536 So.2d 504, 512 (La.App. 1st Cir. 1988), writs denied, 537 So.2d 212, 213 (La. 1989); Smith v. Zellerbach, 486 So.2d 798, 801 (La.App. 1st Cir.), writ denied, 489 So.2d 246 (La.1986). This rule, however, is subject to two well-delineated exceptions, namely (1) that the principal may not avoid liability for injuries resulting from an ultrahazardous activity by hiring out the work to an independent contractor, Ainsworth v. Shell Offshore, Inc., 829 F.2d at 549; Hawkins v. Evans Cooperage Co., Inc., 766 F.2d at 906; Bergeron v. Blake Drilling & Workover Company, Inc., 599 So.2d at 839; Triplette v. Exxon Corporation, 554 So.2d at 1362; Thompson v. Petro United Terminals, Inc., 536 So.2d at 512, and (2) that a principal may be liable for the acts of an independent contractor over which it has exercised operational control or which it has expressly or impliedly authorized.[6]Hawkins v. Evans Cooperage Co., Inc., 766 F.2d at 906.
*536 Ultrahazardous activities are those in which the risk may be altogether reasonable and still high enough that the party ought not to undertake the activity without assuming the consequences. Kent v. Gulf States Utilities Company, 418 So.2d 493, 498 (La.1982). Ultrahazardous activities have been held to include pile driving, storage of toxic gas, blasting with explosives, crop dusting with airplanes, and other similar activity in which the activity can cause injury to others, even when conducted with the greatest of care. Kent v. Gulf States Utilities Company, 418 So.2d at 498. For these particular activities, the courts have imposed absolute liability, which virtually makes the enterpriser an insurer. When the enterpriser, whether or not negligent in any respect, causes damages, the injured party recovers simply by proving damages and causation. Kent v. Gulf States Utilities Company, 418 So.2d at 498.
Whether an activity qualifies as ultrahazardous in Louisiana is a question of law to be determined after a balancing of claims and interests, weighing of the risk and gravity of harm, and consideration of the individual and societal rights and obligations. Ainsworth v. Shell Offshore, Inc., 829 F.2d at 550; Perkins v. F.I.E. Corporation, 762 F.2d 1250, 1266 (5th Cir.1985); Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133, 140 (1971); Triplette v. Exxon Corporation, 554 So.2d at 1362. The court in Perkins, 762 F.2d at 1267-68, discussed the Louisiana doctrine of ultrahazardous activity in detail, finding the doctrine to be defined by three boundaries: (1) the activity must relate to land or some other immovable; (2) the activity itself must cause the injury, and the defendant must be engaged directly in the injury causing activity; and (3) the activity must not require substandard conduct to cause injury. Ainsworth v. Shell Offshore, Inc., 829 F.2d at 550; Hawkins v. Evans Cooperage Co., Inc., 766 F.2d at 907; Triplette v. Exxon Corporation, 554 So.2d at 1362.
We note that Davis argues that this court previously determined that the activity involved was ultrahazardous and that, as such, the court's prior determination is the "law of the case."
The "law of the case" principle embodies the rule that an appellate court ordinarily will not reconsider its own rulings of law in the same case. Sharkey v. Sterling Drug, Inc., 600 So.2d 701, 705 (La.App. 1st Cir.), writs denied, 605 So.2d 1099, 1100 (La. 1992); Glenwood Hospital Inc. v. Louisiana Hospital Service, Inc., 419 So.2d 1269, 1271 (La.App. 1st Cir.1982). The doctrine is a discretionary guide and is not applicable in the case of palpable error or where, if the law of the case were applied, manifest injustice would occur. Sharkey v. Sterling Drug, Inc., 600 So.2d at 705.
In an unpublished opinion, this court reversed the granting of the motion for summary judgment and determined that "[b]ased on the testimony presented, how the explosion occurred remains a question for the trier of fact. Further, whether flammable solvents were present in the tank car upon its arrival at the Independent cleaning facility raises a question of fact for the trial court." The court then went on to say that:
Regardless of the cause of the explosion, the situation presented herein is similar to that in the Thompson case. The activity of cleaning the enclosed interior of a storage tanker, when the nature of the substance contained therein necessitates the use of a highly flammable substance to complete the task is inherently dangerous. Therefore, the rendition of summary judgment in favor of Schneider was inappropriate.
In reversing the trial court judgment granting Schneider's motion for summary judgment, this court determined that issues of fact existed which precluded summary *537 judgment. The contested facts necessitating the reversal of the summary judgment are the precise facts that were developed at the trial on the merits. If this court had determined that the activity was ultrahazardous on the motion for summary judgment, the only issues for the trial court to have determined were causation and damages. However, it is apparent from the record that, prior to the trial of this matter, none of the parties inferred that this court had determined that the activity was ultrahazardous or inherently dangerous.
Moreover, the "law of the case" principle is not absolute, but is a discretionary guide. Given the court's finding that the facts were in dispute, it would have been manifestly unjust to have made a determination that the activity was ultrahazardous or inherently dangerous based on the deposition testimony of only one expert witness and without giving the parties an opportunity to develop the facts fully at a trial on the merits. Moreover, a finding by this court that the activity was ultrahazardous would have been tantamount to granting a summary judgment in favor of Davis when Davis did not file a motion for summary judgment requesting such a determination. A trial on the merits was necessary to determine whether the nature of the substance to be cleaned from the tankers required the use of a highly flammable substance. Therefore, the issue of whether the activity was ultrahazardous and whether Schneider was absolutely liable to Davis was properly before the trial court at the trial on the merits.
In determining whether the activity was ultrahazardous, we need not consider the first two elements of the definition set forth in Perkins because we find that, under the facts of the instant case, the cleaning of tankers does not satisfy the third requirement. This element requires that the activity "can cause injury to others, even when conducted with the greatest of prudence and care." Kent v. Gulf States Utilities Company, 418 So.2d at 498. In other words, the "ultrahazardous" label is limited to those activities which present a "risk of harm that cannot be eliminated through the exercise of due care." (Emphasis supplied.) Ainsworth v. Shell Offshore, Inc., 829 F.2d at 550; Hawkins v. Evans Cooperage Co., Inc., 766 F.2d at 907. It follows that, if the activity can be conducted without a high degree of risk of injury by exercising due care, then it is not ultrahazardous. Hawkins v. Evans Cooperage Co., Inc., 766 F.2d at 907.
In the instant case, the activity conducted by Davis was the cleaning of the interior of a tanker. This work is routinely performed by professional cleaning companies. The cleaning of a tanker containing hardened residue of a flammable resin does not rise to the level of those activities enumerated in Kent, which with the exercise of care and prudence, still encompass a great risk of injury or harm. The record establishes that resin, even hardened resin, can be safely removed with the exercise of due care, and that, as such, the activity is not ultrahazardous.
Clifton R. Diamond was the manager of the Baton Rouge office of Independent from July of 1984, until late 1987 or early 1988.[7] Diamond testified that the placards on the Schneider tanker denoted that the tanker formerly contained a flammable material. The placard on the tanker showed that the tanker contained one of the flammable resins, specifically urea-formaldehyde resin. Diamond identified the MSDS (Material Safety Data Sheet) for urea-formaldehyde resin. According to Diamond, the MSDS could have come via fax or hand delivery or it could have been dropped off with the tanker. The work order also noted that the tanker formerly contained resin, although Diamond acknowledged that there is no indication on the work order as to the exact type of resin contained in the tanker.
Diamond further testified that, in the Baton Rouge area, cleaning a resin tanker was a routine job. He explained that the method of cleaning tankers depended generally upon the type of product formerly contained in the tanker. Sometimes tankers were cold water rinsed, and, at other times, they were hot *538 water rinsed. Hot detergent, hot caustic, pre-solve, and solvent were also available methods of cleaning residue from tankers. Diamond explained that usually 99.9% of resin residue can be cleaned with a caustic wash, and only a small amount of hand labor would be required. But, if the material solidifies, then the cleaning process becomes more complicated, requiring the use of special solvents or hand labor, if the chemicals do not work.
Diamond testified that the work order for the Schneider tanker, dated February 13, 1987, was written when the tanker came into the facility or when the customer informed Independent that the tanker had been delivered. Diamond testified that the work order contained a notation that the tanker arrived with the dome lids open. Diamond testified that the handwriting on the form appeared to be his. He explained that the notation was placed there as an indication to the customer that the resin hardened as a result of the way the tanker came in, and not as a result of the cleaning process, and as an explanation as to why hand labor was necessary. Diamond explained that the dome lids being left open made the tanker more difficult to clean. While leaving dome lids opened increased the possibility of more difficulty in cleaning the tanker, Diamond noted that most of the time resin arrives in a solidified state.
Diamond outlined steps used to clean the Schneider tanker from the work order and assumed that the procedure had been followed. According to the work order, the tanker was caustic washed for one and one-half hours. Diamond explained that caustic is sodium hydroxide, which is used to remove some hard-to-clean materials. Thereafter, the tanker had been cold water rinsed. Apparently, the caustic was not entirely successful because the tanker was then washed with an organic solvent, namely methyl ethyl ketone (MEK). Diamond testified that the purpose of cleaning with MEK was to soften the hardened resin so that it could be removed. Although Diamond testified that he did not know when the resin hardened, he acknowledged that, after the caustic wash, any remaining resin would have hardened. Diamond explained that whatever the caustic does not remove hardens because a caustic wash is performed at a temperature of 180 degrees.
Diamond noted that, after the MEK was used, the tanker should have been rinsed and then dried. Generally, tankers are dried by introducing live steam to heat the tanker, then a forced air blower would blow steam out and lower the temperature within the tanker. This is accomplished by attaching a portable blower to one of the vent ports. The blower would slip over the three inch vent port on the tanker and force the steam out of the tanker. Thereafter, the tanker would be dry.[8]
According to Diamond, the last step to clean the tanker is to mechanically or manually remove the resin by scraping it out with a razor blade scraper.
Diamond further testified that, during the course of business, he instructed his employees that, when there are fumes in a tanker and entry is required, the tanker should be returned through the entire cleaning process to eliminate fumes. Diamond testified that lowering a blower into a tanker, which contained considerable solvent vapor, would be dangerous. In fact, Diamond noted that lowering any electrical device into such an atmosphere would be inherently dangerous. Diamond noted that Davis could have used the main blower system mounted to the building or used steam and then the leaf blower. Moreover, Diamond testified that the workers had access to explosive meters, one to check oxygen content and one to check explosive gases.
Jerry Kersten, a business consultant in the area of hazardous materials and chemical industry information, was admitted as an expert in the fields of chemistry and chemical engineering. In discussing the combustibility and flammability of products, Kersten testified *539 that, under the standards of the Department of Transportation (DOT), a "combustible" product has a flash point between 100 and 200 degrees. A "flammable" material, on the other hand, has a flash point lower than 100 degrees.
Kersten testified that resins are transported as liquids and are dissolved in a solvent of some sort. Urea-formaldehyde resin contains two solvents, namely, xylene and isobutanol alcohol. Xylene is flammable in that it has a flash point of 84 degrees, and isobutanol alcohol, which has a flash point of 82 degrees, is likewise flammable. According to the MSDS, urea-formaldehyde resin has a flash point of 80 degrees, which indicates that the resin, in a liquid state, was flammable. Kersten explained that liquid resin was labeled as flammable because of the presence of the solvents. However, Kersten noted that, when the resin hardened, the solvents contained therein evaporated. As a result, a hardened resin is not flammable in that it will not ignite or have a flash point below 100 degrees. Kersten also testified that a hardened resin is not combustible. However, Kersten acknowledged that a hardened resin is burnable, like wood or paper.
Kersten observed that some resins are soluble in a detergent wash and that hardened resin might be removed with caustic wash or many other non-flammable solvents. Kersten explained that caustic is sodium hydroxide or caustic soda, which is an alkaline material which tends to decompose resins. Sodium hydroxide is not flammable, nor does it cause the resin to become flammable.
In addressing the cleaning of the tanker, Kersten testified that, based upon his information, the tanker was first caustic washed. After the tanker was washed with caustic, it was rinsed with soap and water or plain water at least two to three times. According to Kersten, if the tanker had been caustic washed and rinsed as the testimony suggested, there would not have been a significant amount of solvent in the hardened resin remaining in the tanker.
Kersten further addressed the use of MEK to solvent wash the tanker. According to Kersten, MEK is a very strong solvent, which has an odor like fingernail polish remover and is flammable. The flash point of MEK is 35 degrees. Kersten noted that, assuming the tanker was solvent washed with the MEK and then rinsed, it was extremely unlikely for any xylene or isobutanol alcohol to have remained. Any solvent present after the rinses would have been from the MEK rather than either of the two solvents originally contained in the resin.
In discussing the cause of the explosion and fire, Kersten opined that the vapors from the MEK ignited and that the source of ignition was the blower. In other words, Kersten was of the opinion that the fumes from MEK, and not the other two solvents, exploded. According to Kersten, the residual resin in the tanker was inconsequential in that it did not contribute to the explosion, nor did it make the vapors more flammable. Kersten testified that there were insufficient vapors from the two solvents contained in the resin after caustic wash and rinse to cause an explosion. Moreover, Kersten acknowledged that, if the dome lids had been left open, the resin residue in the tanker would have hardened and that all of the solvent, which had been present in the resin in its liquid state, would have evaporated.
Kersten further opined that Independent was not cleaning the tanker in a safe manner. In his opinion, the tanker was not rinsed after the MEK was used. If the tanker had been rinsed, the vapor level would have been significantly reduced. Moreover, Kersten testified that workers who use MEK should know that it is flammable and to keep it away from an ignition source.
Dennis R. Howard was accepted by the court as an expert in safety, and particularly safety in cleaning tankers. Howard testified that the standards for placards on tankers are nationally regulated by DOT. Howard testified that the placard on the Schneider tanker has three meanings. The upper portion of the placard had the international symbol for fire, which indicates a flammable hazard. The number in the middle of the placard indicates the specific commodity, which in this case was a resin. The number at the bottom of the placard indicates a high degree of flammability.
*540 In formulating an opinion regarding the overall safety of cleaning tankers, Howard assumed that Independent possessed information regarding the contents of the tanker, that Independent tried the caustic wash, which did not clean the tanker, and that Independent then put MEK into the tanker and rinsed the tanker a few times. Howard noted that, although Independent used MEK to clean the tanker, it was not the first remedy utilized. Independent first used hot caustic, which removed approximately ninety percent of the resin. Only after this failed did Independent attempt to use the MEK. When this remedy also failed, Independent then attempted to scrape the remaining resin manually. Howard noted that there were many other methods of removing the resin, which may have been more successful. Stronger concentrations of caustic, for example, can do things differently. Howard pointed out that such a remedy is more expensive, but that it tends to work better.
Based on this information, Howard opined that the cleaning of the tanker is not an inherently dangerous activity. Additionally, Howard was of the opinion that cleaning tankers with MEK is not inherently dangerous. As Howard noted, MEK, in and of itself, will not burn or explode. Within appropriate ranges, it can be used safely and effectively. According to Howard, unless a source of ignition or flame is introduced, MEK will not burn or explode.
John Mason Grymes, III, the state climatologist stationed at the weather service office at Ryan Airport in Baton Rouge, testified via deposition. According to Grymes, he had hourly data for February 13 through February 16, 1987, on a twenty-four hour basis, which was recorded in military time. Grymes acknowledged that he did not personally make the recordings, but that the information was made by personnel with the National Weather Service. However, according to Grymes, it is unlikely that, for a four-day period, a temperature deviation of more than one or two degrees would occur within a three mile radius of Ryan Airport. According to the data, the temperature for the four-day period between February 13, 1987, and February 16, 1987 was between 49 degrees and 74 degrees.[9]
Andrew T. Armstrong was accepted as an expert in chemistry and fires. Armstrong explained that, for any fire to occur, there must be a fuel, an oxidizer in an appropriate mixture, and a source of ignition.
Armstrong testified that, in this case, Schneider transported a flammable liquid known as urea-formaldehyde resin. In order to put resin into a liquid form, two solvents are added during the manufacturing process. According to Armstrong, the two solvents contained in urea-formaldehyde resin are xylene and isobutyl alcohol.
Armstrong testified that the term "flash point" involves heating a liquid to such a point that it will give off sufficient vapors so that it can be ignited with an external source. The flash point of xylene is 80 degrees, and the flash point of isobutyl alcohol is 82 degrees. Moreover, according to the MSDS, the flash point of the resin is 80 degrees. This simply means that each is a flammable liquid. Armstrong testified that, without the presence of the two solvents, resin would not be rated as a flammable liquid.
Moreover, Armstrong explained that, according to the MSDS, for the vapors in the tanker to burn, the concentration level must fall between the upper limit of 10.9 percent and the lower limit of 1.6 percent. If the concentration of the vapors was outside that range, the resin product would not burn. In fact, Armstrong noted that, if one lit a match or smoked a cigarette in a concentration of *541 vapor outside the appropriate range, nothing would happen.
Therefore, Armstrong concluded that, in order for the resin to burn, in addition to having vapor concentration levels of between 10.9 and 1.6 percent, the temperature would have to be 80 degrees or higher. Without the appropriate concentration level and the requisite temperature, the resin would not burn.
Armstrong testified that, assuming that the records from the state climatologist listed the highest temperature on February 13, 1987, and February 14, 1987, as 73 degrees, it was not possible for the resin in the tanker to have burned. Similarly, assuming that the records from the state climatologist listed the highest temperature on February 15, 1987, and February 16, 1987, as 70 degrees and 56 degrees, respectively, it was not possible for the resin in the tanker to have burned. In fact, Armstrong testified that it is physically impossible to get xylene vapors to ignite unless the temperature is 80 degrees or higher.
Moreover, Armstrong noted that, assuming that the tanker had been washed with MEK and then rinsed out with cold water a couple of times, that Davis smelled an odor and used the leaf blower, that there was a fire in which Davis was burned, given the temperature ranges for the period in question, the only fuel source for the fire was the MEK. Armstrong reached this conclusion because MEK is more volatile and has a lower flash point than either of the solvents contained in the resin. According to Armstrong, MEK has a flash point of only 16 degrees, which is below freezing, making it an extremely flammable liquid.
Armstrong explained that the chemical composition of resin does not change by the evaporation of the solvent and that all of the solvent is not lost when the resin residue hardens; traces of each of the two solvents would still be present in the hardened resin residue. However, even though there were still small traces of the two solvents in the resin, in Armstrong's opinion, the presence of xylene and alcohol made little or no difference in total operation. In Armstrong's opinion, the resin had no part in this fire. In fact, Armstrong opined that, if xylene and alcohol had been the only solvents present in the tanker, the incident would not have occurred. Armstrong acknowledged, however, that resin would be a contributor to a solid fire load, but he explained that, if the resin were ignited, it would burn and contribute to the total fire load, similar to a sofa or chair in a room.
In Armstrong's opinion, all of the evidence suggests that the primary and only cause of the initiation of the fire was the fuel load supplied by the MEK and that the other two solvents (xylene and isobutanol alcohol) did not have any activity in the initiation of the fire.
In support of his position that Schneider should be held absolutely liable to him for his injuries, Davis contends that the holdings in Thompson v. PetroUnited Terminals, Inc., 536 So.2d at 504,[10] and Bergeron v. Blake Drilling & Workover Company, Inc., 599 So.2d at 827,[11] require a finding that the *542 activity of cleaning of tankers is ultrahazardous. We disagree.
Unlike the activities presented in Thompson and Bergeron, in the instant case, the Schneider tanker contained a moderately flammable liquid, urea-formaldehyde resin, which in a solid state is not flammable or combustible, but is merely burnable like wood or paper. The resin residue was not a highly explosive chemical, and, within appropriate ranges, MEK can be used to clean tankers safely and effectively. The use of MEK does not pose a serious or dangerous threat to health or safety, unless an ignition source is provided. No known asphyxiants or intoxicants exuded from the resin residue or MEK. The hardened resin residue had no known properties or inherent qualities which posed a serious risk of injury to life and limb. Standing alone, MEK did not have any known properties or inherent qualities which posed a serious risk of injury to life and limb. Moreover, no evidence was presented that any industry standard required that Schneider take a more active role in supervising the cleaning activities.
Further, the evidence showed that it is possible to remove hardened resin without the use of flammable or combustible solvents. The evidence showed that the hardened resin played no part in causing the explosion or initiating the fire in the tanker. Instead, the cause of the fire was the fumes from MEK, which could have been eliminated had the tanker been properly rinsed after the application of the MEK. Finally, other methods of removing the MEK fumes from the tanker were available without the utilization of a leaf blower.
Based upon the evidence of record, we cannot say that the activity of cleaning a tanker containing a hardened resin was an ultrahazardous or inherently dangerous activity. The evidence did not establish that the risks associated with the activity could not be eliminated through the exercise of due care. The evidence showed that resin, even in a hardened form, could be safely and effectively removed from the tanker. Therefore, we find that Schneider is not absolutely liable to Davis for his injuries.

B. NEGLIGENCE
The remaining issue is whether Schneider was negligent. Davis contends that Schneider was negligent for failing to provide sufficient information to Independent and Davis regarding the propensities of the resin and various safety precautions to eliminate the risk of injury and for failing to close the dome lids prior to delivering the tanker.
In a typical negligence case against the owner of a thing which is actively involved in the causation of injury, the claimant must prove that something about the thing created an unreasonable risk of injury that resulted in damage, that the owner knew or should have known of that risk, and that the owner nevertheless failed to render the thing safe or to take adequate steps to prevent the damage caused by the thing. Kent v. Gulf States Utilities Company, 418 So.2d at 497. Under traditional negligence concepts, the knowledge (actual or constructive) gives rise to the duty to take reasonable steps to protect against injurious consequences resulting from the risk, and no responsibility is placed on the owner who acted reasonably but nevertheless failed to discover that the thing presented an unreasonable risk of harm. Kent v. Gulf States Utilities Company, 418 So.2d at 497.
In analyzing the claim for damages, the standard analysis employed is the dutyrisk analysis, which requires proof of five separate elements:
1. Proof that the defendant had a duty to conform his conduct to a specific standard (the duty element);
2. Proof that the defendant's conduct failed to conform to the appropriate standard (the breach element);
3. Proof that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element);

*543 4. Proof that the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and
5. Proof of actual damages (the damages element).
Fowler v. Roberts, 556 So.2d 1, 4 (La.1989); McKeen Homeowners Association, Inc. v. Oliver, 586 So.2d 679, 681 (La.App. 2nd Cir. 1991). See Roberts v. Benoit, 605 So.2d 1032, 1041 (La.1991); Mart v. Hill, 505 So.2d 1120, 1122 (La.1987).
The first element is usually a legal inquiry, and the other four are usually questions of fact. Fowler v. Roberts, 556 So.2d at 4-5; McKeen Homeowners Association, Inc. v. Oliver, 586 So.2d at 681. A finding of negligence must be premised on the existence of a legal duty and a breach of that duty. Whether a duty is owed by one party to another depends on the facts and circumstances of the case and on the relationship of the parties. McKeen Homeowners Association, Inc. v. Oliver, 586 So.2d at 681.
In the instant case, Daniel W. Catena, the division technical director for Cargill, testified via deposition. According to Catena, the product shipped in the tanker involved in the instant litigation was 202053, which is urea-formaldehyde resin solution. Catena explained that the MSDS, which accompanies the product, provides information about hazardous ingredients, how to handle the product, and special precautions for clean-up.
Dwight F. Martin, Sr., one of Davis's coworkers, testified that he had been employed as a laborer cleaning chemical tank cars for more than nine years and that, between 1985 and 1987, he had worked with Independent as an employee of Temp-Timers. Martin testified that he worked on the evening of Sunday, February 15, 1987, and that he worked on the Schneider tanker. Martin testified that he knew that the tanker contained resin because he looked at a copy of the work order, a co-worker named Leroy Putman advised him that the material in the Schneider tanker was a resin, and he looked at the MSDS.
Leroy Putman was employed by Independent for four and one-half years. Putman testified that he knew that resin had been carried in the Schneider tanker because the driver left the bill of lading when the tanker came in and because the information was on the placards on the side of the tanker. From the numbers on the placards, he was able to look up the information in a book to determine the identity of the material which had been transported in the tanker.
In addressing Schneider's responsibility to provide information to Independent, Dennis R. Howard, the safety expert, testified that proper employee training should encompass evaluations of a tanker to determine its contents. According to Howard, this could be accomplished initially by the information on the placards, then by discussions with the driver. Another method of evaluating the tanker was by inspecting the manifest to ensure that the contents of the tanker, as set forth in the manifest, corresponds with the information contained on the placards and with the information provided by the driver. A final manner in which the contents of the tanker could be evaluated was by the MSDS. Howard further testified that he had reviewed various depositions and made several assumptions in reaching an opinion as to whether Schneider had given Independent sufficient information to perform its work properly. Howard assumed that the tanker was delivered to Independent for cleaning and that the MSDS was left with Independent. Based on these assumptions, in Howard's expert opinion, Schneider gave Independent sufficient information to generally know the environment in which Independent would be operating. Moreover, Howard opined that Schneider did all that it should have done in providing information to Independent.
Howard acknowledged that, with regard to the resin residue, Schneider cannot simply throw up its hands and say that it has no responsibility. In his opinion, Schneider has a responsibility to have some reason to believe that Independent knows its business. From his reading of the materials, it was apparent that Diamond knew how to clean tankers and that he had the equipment and rules and practices in place, which had served him well for many years. Howard *544 opined that Independent did not need any more information than what they had been provided with and that Diamond knew all that he needed to know to safely perform the cleaning work.
In the instant case, assuming that Schneider had a duty to provide Independent with information regarding the propensities of the product contained in its tanker, we find that the evidence showed that Independent had sufficient information to know that the tanker contained resin. The information was contained on the work order, the Schneider driver had shown an Independent employee its bill of lading, Independent had the MSDS on the resin product, and the placard on the tanker clearly showed that the tanker carried a resin product. Therefore, any duty Schneider may have had to disclose information relative to the contents of the tanker was discharged.
With regard to whether Schneider was negligent for failing to close the dome lid doors, as set forth earlier in the opinion, the evidence revealed that the receipt of tankers with open dome lids was not unusual. Although leaving the dome lids open permits the resin to harden more quickly, hardened resin can be safely removed from the tanker. Moreover, the cleaning process itself will harden any resin residue which it does not remove. Moreover, the evidence revealed that the accident was not caused by any failure on the part of Schneider to disclose information or close the dome lids, but by the inadequacy of the training of the Independent employees and/or acts of negligence on the part of Independent personnel for whom Schneider was not liable.[12] Finally, the evidence showed that the hardened resin did not cause or contribute to the explosion or resulting fire. The cause of the fire was the failure of Independent to thoroughly rinse the MEK from the tanker, which permitted MEK fumes to accumulate, and the introduction of a source of ignition, the leaf blower, into that environment.
Therefore, we find that the trial court was correct in finding that Schneider was not negligent.

*545 DAMAGES

Because we have determined that Schneider is not liable to Davis under any theory advanced, we find it unnecessary to address the issue of damages.

CONCLUSION
For these reasons, the judgment of the trial court in favor of Schneider and against Davis, dismissing Davis's demands at his cost, is affirmed. Davis is cast for all costs on appeal.
AFFIRMED.
SHORTESS, J., concurs with reasons.
SHORTESS, Judge, concurring.
The evidence here clearly permits a fact finder to select from two permissible views. A Stobart analysis requires us to affirm because a fact finder's decision chosen from two permissible views cannot be reversed.
I respectfully concur.
NOTES
[1] Resin is used in a variety of products, including varnish, paint, or ink film. Resins are also present in adhesives and plastic materials. The particular resin which had been contained in the Schneider tanker was resin 202053, which is used as curing agent for other types of resin coatings.
[2] At trial, the parties entered into a stipulation with regard to the intervention. The stipulation provided that, prior to and on the day of the accident, February 16, 1987, Davis was employed with Temp-Timers, performing duties as a laborer. The stipulation further provided that, at that time, Commercial Union provided a policy of worker's compensation insurance to TempTimers, providing all benefits required pursuant to the Louisiana Worker's Compensation Law. The parties also stipulated that, as a result of the February 16, 1987, accident, Commercial Union paid Davis a total of $25,420.58 in medical benefits and $4,970.00 in weekly worker's compensation benefits.
[3] In an unpublished opinion, dated January 12, 1990, under docket number 89 CA 0085, this court affirmed the trial court judgment.
[4] Attached to Schneider's motion for summary judgment were the depositions of Jerry Kersten, Leroy Putman, and C.R. Diamond.
[5] The record is devoid of any motion for appeal filed by Commercial Union. Therefore, the trial court judgment is final as to Commercial Union.
[6] Under the second exception, a principal may be liable for the acts of an independent contractor over which it has exercised operational control or which it has expressly or impliedly authorized. Hawkins v. Evans Cooperage Co., Inc., 766 F.2d at 906; Triplette v. Exxon Corporation, 554 So.2d at 1363. It is not the supervision and control which is actually exercised that is significant, but it is the right to exercise it which is of primary concern in determining whether a principal may be held liable for the torts of an independent contractor. Triplette v. Exxon Corporation, 554 So.2d at 1363. The fact that the owner periodically inspected the job site to be sure that the work was being performed in accordance with the specifications does not constitute the exercise of operational control. Triplette v. Exxon Corporation, 554 So.2d at 1363. Further, the court in Hemphill v. State Farm Insurance Company, 472 So.2d 320, 322 (La.App. 3rd Cir.1985), stated that the "control" determination "depends in great measure upon whether and to what degree the right to control the work has been contractually reserved by the principal. The supervision and control which is actually exercised by the principal is less significant."
[7] Diamond had a chemistry background, had worked in lab at DOW Chemical, and had done a fair amount of environmental work for truck companies and other concerns engaged in the business of cleaning tankers.
[8] Diamond noted that the blowers available to the workers were portable leaf blowers, similar to those for household use. Independent had two or three such blowers. To his knowledge, there was no other use for the blowers. In fact, Diamond testified that this was the first situation where the blower had been used for something other than drying a tanker.
[9] The results of those recordings for the four-day period were attached to his deposition and revealed the following:
February 13, 1987
 high 74 degrees
 low 52 degrees
February 14, 1987
 high 73 degrees
 low 51 degrees
February 15, 1987
 high 70 degrees
 low 59 degrees
February 16, 1987
 high 58 degrees
 low 49 degrees

[10] Thompson v. PetroUnited Terminals, Inc., 536 So.2d at 504, involved a storage tank at a bulk storage tank facility owned and operated by PetroUnited. In Thompson, the evidence presented at trial showed that the tank contained a highly explosive chemical, which was a known asphyxiant and intoxicant and which could cause severe or fatal injuries if inhaled. The propensities of the product when combined with the slightest human error could culminate in disaster. The chemical was so dangerous that the leading petroleum industry associations published guidelines to prevent or reduce the risks associated with that type of work. Those industry standards required that tank owners ensure that the tanks were below flammable limits before entry into the tank was attempted. In finding that cleaning a tank containing a highly explosive chemical is inherently dangerous, the court noted that the unsafe methods used by the contractor were impliedly authorized by the owner by its failure to provide any guidelines for entry and cleaning, its failure to discuss and approve the contractor's methods of cleaning, and its failure to monitor the activities of the contractor as required by the industry guidelines.
[11] The court in Bergeron v. Blake Drilling & Workover Company, Inc., 599 So.2d at 827, relying on Thompson, held that the perforation of an oil well pipe by the use of explosives, similar to cleaning a confined area filled with explosive gases, is an inherently and intrinsically dangerous activity. The court further held that the owner had a duty to investigate, discuss, and approve the methods of its contractor. The court then held that the owner was either absolutely liable for engaging in an ultrahazardous activity or was liable for the negligence of its contractor and itself because they were both engaged in inherently and intrinsically dangerous work.
[12] The testimony showed that Independent implemented limited training procedures for its employees and the Temp-Timer employees it utilized.

Davis testified that he worked for various companies, including Temp-Timers, between May, 1986, and February, 1987. According to Davis, he began working with Temp-Timers in January, 1987, and began going to Independent only a few weeks later. Davis explained that he worked at Independent on an as-needed basis an average of three to four times a week. Davis described his duties with Independent as basically using "comet, [and] a squirrel pad." Generally, he was assigned to clean latex paint off of tanker walls. Davis testified that he was not given any instruction on safety while he worked at Independent. He knew of no safety equipment, such as eyewash, first aid, oxygen masks, dust masks, or boots, available for his use. Nor was he aware of the availability of an explosive meter or gas masks.
Clifton R. Diamond, the manager of Independent, testified that he trained the shift supervisor and that the employees had safety meetings about various safety topics. The shift supervisors were to instruct the temporary personnel.
John Wurzbach, another co-worker, testified that he worked as the assistant manager at Independent in 1987. Wurzbach usually worked the day shift and was unaware of any safety programs originated at Independent during his tenure there. Generally, the workers were not given any instruction on how to do something; they were simply advised whether the material was flammable or corrosive and cautioned to refrain from getting any of the material on themselves. Wurzbach acknowledged that most of the time there was a placard on a tanker, which indicated whether the material was flammable or combustible. With regard to instructions relative to use of the leaf blower, Wurzbach stated that the workers were advised to plug the leaf blowers in such a way as to avoid being shocked.
Howard, the safety expert, advised that certain precautions by the workers would be necessary to safely perform the cleaning. The environment within the tanker should be sampled using a combustible gas meter to determine the flammable ranges, or in other words, the upper and lower explosive limits. If entry into the vessel was necessary, then samples of the oxygen content should be taken. Any oxygen readings over 19.5 percent would be considered safe levels. However, readings below that level may require an air supply for entry. To work in such an environment, the worker should be able to recognize and appreciate his environment. This could be accomplished by knowing the identity of the solvent by name and the general characteristics of the solvent. Moreover, if a worker was presented with a situation which he was unprepared to handle, someone should be available from whom he could seek advice. Moreover, prior to introducing any flame or spark into or near an environment, the worker should make certain that the vessel is gas-free. In his opinion, Independent's employees were inadequately trained.