674 So.2d 349 (1996)
Timothy H. SANDBOM
v.
BASF WYANDOTTE, CORP.
No. 95 CA 0335.
Court of Appeal of Louisiana, First Circuit.
April 30, 1996.
*352 John deGravelles, Baton Rouge, for Plaintiff-Appellee, Timothy M. Sandbom.
Gary Bezet, Baton Rouge, for Defendant-Appellant, BASF Wyandotte Corp.
Judy Atkinson, Baton Rouge, for Defendant-Appellee, Hartford Ins. Co., Twin City Fire Ins. Co., Aetna Casualty & Surety.
John L. Dardenne, Jr., Baton Rouge, for Defendant-Appellee, La. Environmental Sales/Third Party.
Mark S. Taylor, Metairie, Intervenor/Aetna Casualty.
Before CARTER and PITCHER, JJ., and CRAIN[1], J. Pro Tem.
HILLARY J. CRAIN, Judge Pro Tem.
In this personal injury action, Timothy Sandbom alleges he was injured when exposed to chemicals while cleaning a reservoir storage tank at the BASF Corporation (BASF) chemical plant in Geismar, Louisiana.
The Geismar plant contains an MDI unit which manufactures the chemical methyl diphenyl isocyanate (MDI). The chemicals which leak or spill out of storage vessels in the MDI unit, as well as rainwater which may become contaminated with trace chemicals from the plant, are channeled into a concrete drainage ditch and flow from the ditch into a thirteen foot deep concrete tank, referred to as Tank 837, where it is collected. The contents of the tank are then pumped into a biotreatment or oxidation pond. The purpose of the tank is to prevent the chemicals, which have either spilled or overflowed, and the contaminated rainwater from entering the ground. At any given time, Tank 837 may contain various chemicals as well as rainwater contaminated with trace chemicals. The only way to ascertain which chemicals are in the tank at any given time, and the concentration level of those chemicals, is by testing the tank contents.
In August, 1986, Tank 837 was clogged, and its contents could not be pumped into the biotreatment plant. When the tank becomes clogged, its contents are vacuumed by hose into a vacuum truck which, in turn, empties the contents into the biotreatment plant. The maintenance and unclogging of this tank is contracted out to companies, such as Louisiana Environmental Sales and Service, Inc. (Louisiana Environmental), which specialize in such work, rather than being performed by BASF employees.
Mr. Sandbom was employed as an operator by Louisiana Environmental, a corporation which contracts to perform environmental clean-up at regional chemical plants. Louisiana Environmental was hired to clean out the tank.
On the morning of August 8, 1986, Mr. Sandbom and his supervisor, Steve Armstrong, arrived at the BASF plant in a vacuum truck owned by Louisiana Environmental. Mr. Sandbom alleges that, after arriving at the plant, the crew went to the location of Tank 837 and began work. Mr. Sandbom placed the end of the vacuum hose into the tank and began vacuuming the contents into the vacuum truck. After the liquid contents were removed from the tank, Mr. Sandbom noted that he could not vacuum the remaining contents which were solidified. Without wearing protective safety gear, he entered the tank and, using a pick which was handed to him by a BASF employee, began to manually break-up the solids into pieces which could be vacuumed into the truck. He alleges that, while working inside the tank, he noticed an odor. He felt dizzy, and his eyes burned. He notified his supervisor, Mr. Armstrong, who spoke *353 with BASF personnel. Mr. Armstrong then advised Mr. Sandbom to continue doing the job. Mr. Sandbom was not warned to protect himself from exposure to potentially toxic chemicals which could be in the tank.
On the following day, which was a Saturday, Mr. Sandbom drove to Bunkie with his wife. While driving, he became ill, had a panic attack, and had to pull off the road for a while. He went to the nearest hospital emergency room where he was treated for dizziness, shortness of breath, chest pain and numbness in the arms. He was treated with Xanax, an anti-anxiety medication.
On the following Monday, he returned to work at the BASF plant. He again entered the tank, without wearing protective gear, to complete the vacuuming process. He experienced symptoms similar to those experienced on the previous Friday. He left the tank and went to the BASF infirmary and was subsequently taken to the local hospital where he was treated for shortness of breath, chest pain, anxiety, overall weakness, and allergic rhinitis. Mr. Sandbom continued working for Louisiana Environmental until 1987 when he was fired. The reason for his firing was contested at trial. Among the explanations were: he was absent from work, he hired a lawyer, or he was unable to continue doing the job.
Mr. Sandbom contends that he suffered severe personal injuries as a result of exposure to the chemicals in the tank. He instituted this personal injury action against BASF and its insurer, Twin City Fire Insurance Company (Twin City); Curry St. Pierre, a BASF employee, and various insurers. BASF filed a third party action against Louisiana Environmental. Aetna Casualty and Surety Company (Aetna) intervened as the workers' compensation insurer of Louisiana Environmental. Twin City denied coverage. The claim against St. Pierre was dismissed with prejudice on joint motion by plaintiffs, Aetna, and defendants. The third party action by BASF against Louisiana Environmental was reserved for trial on a future date and is not before this court.
After a bench trial on the merits, judgment was rendered in favor of plaintiffs and against defendant, BASF. Judgment was also rendered in favor of intervenor, Aetna, and defendant, Twin City. From this judgment BASF appeals alleging as error:
1. The trial court erred, as a matter of law, in finding BASF negligent when the evidence is clear that BASF owed no duty whatsoever to the plaintiff.
2. The trial court erred, as a matter of law, in accepting and relying upon the testimony of Dr. Thomas Callender[2] when that testimony does not meet the standards imposed by law for the admissibility of expert testimony.
3. The trial court erred as a matter of law in finding that the plaintiffs had met their burden of proving that Mr. Sandbom is permanently and totally disabled.
4. The trial court erred as a matter of law in failing to find the [sic] Mr. Sandbom comparatively negligent.
5. The trial court erred as a matter of law in failing to find that there was coverage under the Twin City policy under the facts of this case.
Plaintiffs have also appealed alleging as error: (1) quantum; (2) the reimbursement to Aetna for workers' compensation benefits paid to Mr. Sandbom; and (3) the judgment in favor of Twin City.

LIABILITY OF BASF
In its first assignment of error BASF contends that Louisiana Environmental was an independent contractor and, as the principal, BASF owed no duty to provide a safe workplace to employees of its subcontractor. Further, BASF could only be liable to an employee of a subcontractor if it voluntarily assumed the duty to provide a safe workplace and was negligent in so doing.
Under Louisiana law, a principal is generally not liable for the offenses committed by an independent contractor while performing its contractual duties. Liability of the principal to an employee of the independent *354 contractor, for injuries sustained by the employee while performing the contract, is limited by the application of this principal. This rule is subject to two exceptions. First, the principal may not avoid liability for injuries resulting from an ultrahazardous activity by hiring out the work to an independent contractor. The second exception arises when the principal reserves the right to supervise or control the work of the independent contractor, Crane v. Exxon Corp., U.S.A., 613 So.2d 214 (La.App. 1st Cir.1992), writs denied in part, granted in part on other grounds, and remanded, 620 So.2d 858 (La.1993); Triplette v. Exxon Corp., 554 So.2d 1361 (La.App. 1st Cir.1989), or gives express or implied authorization to an unsafe practice. Ewell v. Petro Processors of Louisiana, Inc., 364 So.2d 604 (La.App. 1st Cir. 1978), writ denied, 366 So.2d 575 (La.1979).
An activity is "ultrahazardous" if the following three criteria are present: the activity is related to land or some other immovable; the activity causes the injury and the defendant is directly engaged in the injury causing activity; and the activity can cause the injury even when conducted with great prudence and care. Davis v. Insurance Co. of North America, 94-0698 (La.App. 1st Cir. 3/3/95); 652 So.2d 531, writ denied, 95-0840 (La. 5/5/95); 654 So.2d 334. The parties here do not contend that there was no safe method in which the job could have been performed. Environmental clean-up crews do this type of work on a regular basis. Thus, the ultrahazardous exception to non-liability of the principal does not apply to this case.
The first part of the second exception arises when the principal reserves the right to supervise or control the work of the independent contractor. Actually, this exception is usually considered in the context of whether the status of independent contractor is maintained. Triplette v. Exxon, 554 So.2d at 1363.
The criteria for determining the independent status of a contractor was discussed by this court as follows:
It is not the supervision and control which is actually exercised that is significant, but it is the right to exercise it which is of primary concern in determining whether a principal may be held liable for the torts of an independent contractor. The fact that the owner periodically inspected the job site to be sure that work was being performed in accordance with the specifications does not constitute the exercise of operational control.
Id. (emphasis original) (citations omitted).
Louisiana Environmental was under a one-year contract with BASF to perform hydroblasting, sump cleaning and related work as requested by BASF. Paragraph six of the contract provides:
Unless otherwise specified, all materials shall be new and both workmanship and materials shall be of good quality. Contractor shall at all times require its employees to comply with all applicable safety rules of Purchaser, shall enforce strict discipline and good order among its employees, and shall not assign to the work any person or entity unfit or unskilled in that portion of the work so assigned.
In Triplette v. Exxon, 554 So.2d at 1363, and Crane v. Exxon, 613 So.2d at 220, this court stated that a contractual clause requiring the independent contractor to comply with the safety standards of the principal was not sufficient to vitiate the principal-independent contractor relationship. The decisive element is whether the principal has retained the right of direct supervision of the step-by-step process of accomplishing the work. The contract in the instant case contains no such provision. Thus, the principalindependent contractor status was preserved.
The second part of the second exception is when the principal gives express or implied authorization to an unsafe practice. Even though it is sometimes considered as part of the second exception, our analysis of the jurisprudence reveals that this criteria is not actually used to determine status, but is really a separate criteria that renders the principal liable for the negligence of an independent contractor. Parker v. Boise Southern Co., 570 So.2d 6 (La.App. 3d Cir.1990), writ denied, 575 So.2d 388 (La.1991); Thompson v. PetroUnited Terminals, Inc., 536 So.2d 504 (La.App. 1st Cir.1988), writs denied, 537 *355 So.2d 212, 213 (La.1989); Williams v. Gervais F. Favrot Co., 499 So.2d 623 (La.App. 4th Cir.1986), writ denied, 503 So.2d 19 (La. 1987); Ewell v. Petro Processors, 364 So.2d at 606-607. Compare Massey v. Century Ready Mix Corp., 552 So.2d 565 (La.App. 2d Cir.1989), writ denied, 556 So.2d 41 (La. 1990). In fact, in dealing with the two exceptions, some cases cite only the giving of express or implied authorization to an unsafe practice as being the second exception to a principal's non-liability for acts of an independent contractor. See Parker, 570 So.2d at 11. Unlike the first part of the second exception, it assumes the status and imposes liability in spite of status. For clarity, it should more appropriately be analyzed as a third exception, or as being the sole second exception, leaving the retention of supervision and control as a determination of independent contractor status, rather than an exception to non-liability of an independent contractor.
The record contains evidence that BASF did expressly or impliedly authorize Mr. Sandbom to enter the tank without the proper safety gear and without running the appropriate tests to identify the chemicals to which he was being exposed so that he could take appropriate precautions. Nor did BASF monitor the conditions in the tank during the cleaning process. Consequently, we find BASF liable to the plaintiff for giving express or implied authorization to an unsafe practice.
Tank 837 is a thirteen foot deep concrete tank, and, for safety purposes, is considered a confined space. In order to promote personnel safety, BASF established standard work practices and procedures to be followed for entering a confined space which has held flammable, explosive, acidic, or toxic materials, or where noxious odors or oxygen deficiencies may exist. Prior to entering a confined space, there must be express approval by the BASF area supervisor who must issue a safety checklist or work safety permit. The permit must be issued by the area supervisor only after he is personally satisfied with vessel preparation, precautions to be taken, procedures to be followed, and safety equipment to be used. When an employee is within a confined space, an attendant who is knowledgeable of proper emergency procedures must be stationed immediately outside the vessel. Additionally, air readings must be performed to test for toxic vapors, flammability and explosibility levels. Samples of the tank contents must be taken to determine to which chemicals, if any, the employee will be exposed. Additionally, any employee entering the tank must have available a full-faced air mask with oxygen and wear a harness and rescue line.
James Martin Logan, the manager of the MDI unit of the BASF plant in August, 1986, stated that if a contractor's employees performed any work at the BASF plant with the permission of BASF, without obtaining a work safety permit, this action would be in violation of BASF rules. Mr. Logan was not at the plant on August 8, 1986. He did not learn of the alleged incident until approximately one year later when this action was filed. After learning of this action, he attempted to learn as much as he could about the alleged incident. The only documentation of the job which he could find was a notation in the logbook which stated "vacuuming out the sump." He stated that, because he did not learn of the incident immediately, he was unable to reconstruct the contents of the tank, which chemicals were in the tank and the concentration of each chemical.
Curry Joseph St. Pierre, the production manager of the MDI unit in 1986, agreed that, if BASF allowed Mr. Sandbom to enter Tank 837 without the required gear, this would have been a violation of BASF safety policies. He stated that he could not locate the safe work permit for the August 8, 1986, job. However, he was certain that a permit was issued because no job could be done at the plant without one.
George A. Miller was the maintenance coordinator for the BASF plant in 1986. Mr. Miller stated that, for jobs which require entry into a confined space at the plant, the contractor or employee must obtain a vessel entry permit, a vessel entry kit, and a safe work permit. The work permit would specify the safety precautions which must be followed for vessel entry. Additional verbal *356 safety instructions would also be given to the employee or contractor at the time the permit was obtained. Mr. Miller called Louisiana Environmental and informed the contractor that Tank 837 needed cleaning. A work permit, which included the contractor's name, the tank number, the job to be done and the precautions which must be taken to do the job, was completed by BASF personnel. Mr. Miller did not recall what was specifically included in that particular permit, nor could he recall which employee issued the permit. He stated that he was certain that the tank contents were not tested in preparation for the job. He testified that he brought the Louisiana Environmental crew to the tank, stayed with them for approximately fifteen minutes, and returned to observe them every thirty to forty-five minutes. At no time on that day did he observe a Louisiana Environmental employee enter the tank. Had he observed anyone inside the tank that day, that person would have been "put ... out the gate" for violation of BASF policies because the tank was not prepared for vessel entry. Additionally, he stated that he would not have given the cleaning job to Louisiana Environmental if vessel entry were required to do the job, because Louisiana Environmental was not equipped to handle vessel entry.
Alvin W. Davis, who was a founder and co-owner of Louisiana Environmental at the time of this incident, testified that he arrived at the BASF site with his work crew on August 8, 1986. He often visited various sites where his crew was working. He stated that he could not recall whether a work safe permit was issued by BASF on that date. He recalled no instructions or safety requirements being given by BASF to his crew. Louisiana Environmental's policy regarding safety procedures and practices was to follow the safety standards of the plant for which the job was being done. BASF did not inform Louisiana Environmental that this was to be a "fresh air job" or a job which required full-face oxygen. The Louisiana Environmental crew had no breathing apparatus for this job, because they had not been informed it would be required. However, Louisiana Environmental would have provided the apparatus had it been informed the breathing apparatus was required. Mr. Davis stated that he observed Mr. Sandbom begin vacuuming the liquid contents of the tank. Subsequently, the vacuum hose was unable to suck up the solid contents. Then, he observed Mr. Sandbom and Mr. Armstrong enter the tank. Mr. Armstrong showed Mr. Sandbom how to break up the solid contents, and then Mr. Armstrong exited the tank. Mr. Sandbom was left inside the tank to complete the job. Mr. Davis then left the BASF plant to visit other Louisiana Environmental worksites.
In written reasons for judgment, the trial judge found that BASF either intended, or had reason to expect, that the Louisiana Environmental crew would enter Tank 837 in order to clean it. This conclusion was based on evidence that both before and after the August 8, 1986, incident, work crews of other contractors had to enter Tank 837 in order to clean it. In those instances, the employees were provided safety gear, and BASF safety procedures for confined space entry were followed. This included testing the contents and atmosphere of the tank for chemical exposure. The trial court thus concluded that BASF had violated its own rules and safety procedures and was negligent in exposing Mr. Sandbom to harmful chemicals without proper warnings or safety equipment.
A reviewing court may not set aside the factual findings of the trial court or jury if the findings are reasonable in light of the record reviewed in its entirety. Stobart v. State, Department of Transportation and Development, 617 So.2d 880 (La.1993). Although there was conflicting evidence about whether BASF intended or expected Louisiana Environmental employees to enter the vessel in order to clean Tank 837, there is a reasonable basis from the record reviewed in its entirety for the trial judge's findings in this regard. If vessel entry was required or anticipated, BASF should have followed its own safety procedures and precautions which required notifying Louisiana Environmental about the particular toxic hazards it would likely encounter. It should have also specified the safety procedures and safety equipment necessary to safely do the job. The *357 vessel entry by Mr. Sandbom was necessary to successfully clean out the tank. Without the proper safe work permit procedures the vessel entry was likely to result in placing the entrant at risk.
BASF cites Crane v. Exxon, 613 So.2d 214, in support of its contention that a principal does not owe an independent contractor the duty to furnish a safe workplace. In Crane v. Exxon, the liability of Exxon was based upon the independent negligence of the principal, Exxon. Crane was a senior journeyman millwright. His employer contracted with Exxon to construct facilities for the installation of a compressor on a raised platform. Crane was injured while working on the construction job at the Exxon plant by falling through an open chute in the platform being constructed. In considering the particular facts and circumstances of that case, we found that, contractually, Exxon, the principal, had no duty to provide a safe workplace for the independent contractor's employees. However, we found that Exxon had assumed the duty to supervise the job to ensure that the contractor complied with Exxon safety requirements. In Crane, we did not state that a principal never owes a duty to provide a safe workplace to an independent contractor. What we actually stated was: "Duty is a question of law. The particular facts and circumstances of each individual case determine the extent of the duty and the resulting degree of care necessary to fulfill that duty." Id. at 221 (citations omitted).
Although we have found that there is a basis for liability on the part of BASF in giving express or implied authorization to an unsafe practice, there is also a basis in terms of independent negligence. BASF did not owe the duty to provide Mr. Sandbom a workplace which was free of all noxious or toxic chemicals, because the nature of the job which Louisiana Environmental performed, environmental hazard cleanup, required working amidst potentially harmful chemicals. However, the job could be performed in a safe manner if proper precautions were taken. In order for Louisiana Environmental to perform the job of cleaning out the reservoir tank in the safest manner possible, the work crew needed to be informed of the chemicals to which they would be exposed in the course of their work. BASF, a chemical manufacturing plant, was in a superior position to Louisiana Environmental and Mr. Sandbom to test for and learn the exact nature of the chemicals contained in the tank and their concentration levels at the time of entry into the vessel. The safety equipment used and the safety precautions taken by the crew entering the vessel are dependent on the nature of the chemical hazards to which the crew was likely to be exposed. BASF had no duty to clean out the tank itself in order to ensure that there were no chemicals in the tank which Louisiana Environmental would encounter. However, under these circumstances, BASF owed to Louisiana Environmental and Mr. Sandbom the duty to notify them of the chemical hazards which could be encountered. BASF breached this duty and, consequently, was independently negligent with reference to Mr. Sandbom.

COMPARATIVE FAULT OF PLAINTIFF
In the fourth assignment of error, BASF contends the trial court erred in failing to find Mr. Sandbom comparatively negligent. We have reviewed the record and find no support for BASF's claim. Mr. Sandbom was told to do a job, and he did it. He relied on BASF to inform him of the toxic chemicals in the tank and of the safety precautions necessary to protect against those chemicals. No such information was given. When he noticed an offensive odor and began to have physical complaints, he immediately reported those complaints to his supervisor, Mr. Armstrong. Mr. Armstrong advised him to take a break while he (Mr. Armstrong) consulted with BASF personnel about the matter. He was later ordered to re-enter the tank to complete the job. The trial judge's finding in this regard is not manifestly erroneous.

ASSIGNMENT NO. TWO
In this assignment, BASF contends that the trial court erred, as a matter of law, in accepting and relying on the testimony of Dr. Callender because his testimony did not meet "the standards imposed by law for the admissibility of expert testimony." BASF *358 additionally argues that, even if admissible, Dr. Callender's testimony is not entitled to any weight because it is inconsistent; contradictory; without support in medical literature and is contradicted by all other physicians in this case.
We assume that, in raising this issue, BASF is challenging Dr. Callender's qualifications in occupational medicine and toxicology. It is undisputed that Dr. Callender is a physician who is board certified in internal medicine. He is not board certified in either occupational medicine or toxicology. He has, however, had much experience in practicing occupational medicine and its relationship to toxicology. He was treating approximately two hundred patients for chemical exposure at the time of trial, and his practice was concentrated in the field of occupational medicine. He has studied toxicology by attending medical education lectures and by taking hands-on courses which are approved by his specialty board. Additionally, several of his research papers in these fields have been published in medical journals.
If a witness who is qualified as an expert has scientific, technical, or other specialized knowledge which will assist the trier of fact to understand the evidence or to determine a fact at issue, the witness may testify in the form of an opinion or otherwise. La.C.E. art. 702. The trial judge has great discretion to decide whether a particular witness will be allowed to testify as an expert. This decision may not be disturbed unless manifestly erroneous. Mistich v. Volkswagen of Germany, Inc., 95-0939 (La. 1/29/96); 666 So.2d 1073. Dr. Callender testified by deposition. His deposition was admitted into evidence without objection. In written reasons for judgment, it is clear that the trial judge implicitly accepted him as an expert in the field of internal medicine with subspecialities in occupational medicine and toxicology. We find his decision to accept Dr. Callender as an expert in those fields is not manifestly erroneous.
As to the weight of Dr. Callender's testimony, he is one of Mr. Sandbom's treating physicians. He performed diagnostic tests and evaluated Mr. Sandbom to determine whether his condition was organic in nature and if it was related to exposure to neurotoxins. Neurotoxins are chemicals or substances which are toxic to nerve tissue, such as the peripheral nerve tissue of the brain or spinal cord.
Dr. Callender stated that both MDI and MCB are neurotoxins which are produced or found at the plant. Even without being able to identify the neurotoxins to which Mr. Sandbom was exposed, in Dr. Callender's opinion, Mr. Sandbom had experienced a neurotoxic event. He based his opinion on the progression of Mr. Sandbom's symptoms and the test results, which are consistent with exposure to neurotoxins, particularly MDI. In his opinion, exposure to MDI alone could have caused Mr. Sandbom's symptoms.
Through the testimony of several of its expert witnesses, namely Dr. Raymond Harbison, BASF attempted to prove that MDI is not a neurotoxin and the chemicals to which Mr. Sandbom was exposed were not toxic. If they were not toxic, they could not have caused the brain damage which Drs. Callender, Ehrlich and Rostow diagnosed.
Dr. Henry Ehrlich, Mr. Sandbom's treating psychiatrist, testified by deposition. He began treating Mr. Sandbom in July, 1987. His initial diagnosis was panic disorder caused by exposure to chemicals at work. In order to make the diagnosis of panic disorder, the patient must suffer at least four of the following symptoms: shortness of breath, chest pain, dizziness, tingling or numbness, fear of dying, fear of smothering, rapid heartbeat, sweating, derealization or depersonalization. Dr. Ehrlich has previously treated another patient suffering from panic disorder caused by chemical exposure. Mr. Sandbom has been treated by Dr. Ehrlich several times a month since his initial visit in 1987. At time of trial, Mr. Sandbom continued with this treatment schedule.
Dr. Ehrlich eventually noted that Mr. Sandbom had significant memory problems. He was referred to Dr. Cary D. Rostow, a neuropsychologist, for evaluation. As a result of Dr. Rostow's evaluation, Dr. Ehrlich revised his diagnosis to organic anxiety disorder and mixed organic brain disorder. Dr. Ehrlich explained that organic brain disorder *359 is an organic process characterized by an anxiety disorder or panic disorder, depression, loss of memory and perhaps loss of intellect. In his opinion, this condition was caused by exposure to a chemical or chemicals at the workplace as alleged by Mr. Sandbom. When queried whether Mr. Sandbom was malingering, Dr. Ehrlich responded:
A. I think it is an organic basis that he has the panic disorder, the depressive symptoms that he has and the loss of memory. And, I would agree with Dr. Rostow and Dr. Callender on that. Now, I do not think Mr. Sandbom is malingering. I have seen him, and it seems like two hundred times. His story does not change. It's consistent. He is sometimes very, very anxious. I know that he is scared to death and has a panic disorder because I have been called from the emergency room and I will be called when he is down to his last four or five pills. He is absolutely beyond himself and will call persistently to my answer service until I tell him I will give him some more Xanax, which is somewhatwhich isbecause he will have a panic attack. He has had several panic attacks, twenty to thirty panic attacks over the time that I have known him. A lot of the times he goes to emergency rooms and other times he just takes Xanax. So, what you do withwhat we do is continue the patients on Xanax, even though it is an addicting drug. If he misses taking it for six hours he will start to get nervous. He is also very dependent psychologically on Xanax. If he doesn't have it around it immediately triggers him to get apprehensive so that he really needs to have it. So, in all of the interactions that I have had with Tim around the problem of the panic disorder, he is very consistent.
I think there have been some depressive symptoms. Originally I used Tofranil and a lot of psychotherapy for the depression. After the first year and a half I don't think he really had depressive symptoms. I think that washe was over that and he was beginning to get adjusted to being work disabled. The depressive symptoms have been in remission, so I haven't had to use an antidepressant agent. We can useI have been able to use less individual sessions. As far as his memory problems, they have been consistent. I have talked to his wife once or twice a year, at least during the timeevery year that I have seen him, and according to her and according to him, the memory problems are consistent and unchanging. The organicif this is an organic brain syndrome, it's not clearing up. If this were, as Dr. Culver says, memory problems due to anxiety and depression, it's not clearing up. I think it's organic. But, in any case, it's not clearing up. He does have memory problems. His relationships with his family are impaired. He is impaired socially. He is not functioning at church as he usually does. Although, he hashe has begun to function somewhat better in the group, much better in the group.
Dr. Rostow evaluated Mr. Sandbom at the request of Dr. Ehrlich, on two occasions. In order to evaluate Mr. Sandbom, Dr. Rostow performed numerous tests. After completing the testing, Dr. Rostow's diagnosis was organic brain dysfunction which aggravated a preexisting personality disorder. The cerebral dysfunction is diffused or generalized throughout the brain. In his opinion, the combination of the organic cerebral dysfunction and the personality disorder caused a "catastrophic reaction." There was definitely a physical brain abnormality. He did not think that Mr. Sandbom was malingering, however, in his opinion, Mr. Sandbom's performance in testing indicated the presence of an extremely poor level of effort, lower intellectual functioning, and/or an anxious mood. He stated he would defer to Dr. Ehrlich regarding disability evaluations, functioning and overall etiology.
In written reasons for judgment, the trial court set forth the following facts and findings:
There is no doubt that Timothy M. Sandbom was exposed to chemicals while in the pit and he suffered both immediate and short term physical problems as a result of *360 this exposure. The more serious issue is whether this exposure caused the brain damage diagnosis by Timothy M. Sandbom's treating physicians. The testimony on this point is highly technical and contradictory.
Because neither the contents of the pit nor the air above it were ever tested (this is one of the procedures BASF failed to follow), no one can say exactly what was in the pit or in what concentrations. BASF employee, James Longan, [sic] testified that methyldiisocyanate (MDI), monochlorobenze (MCB), and urea could have been present in the pit at the time Timothy M. Sandbom entered it. All parties admitted that when a person is exposed to certain levels of these chemicals they can suffer adverse physical reactions. It is the nature and extent of these physical problems that is the center of the dispute.
Dr. Thomas Callendar, a medical doctor specializing in toxicology, performed many tests on Timothy M. Sandbom. Based on his examinations and testing of Timothy M. Sandbom, as well as his review of the reports from the other physicians, Dr. Callendar testified that the brain damage, or what he called `toxic encephalopathy' was the result of his exposure to these chemicals, either singly or in combination. Dr. Callendar stated that both MDI and MCB have the ability to affect the human nervous system and brain and are therefore, `neurotoxic'. Furthermore, he states that MDI is reactive and that the product of MDI and the other chemicals may very well itself have been neurotoxic. It was Dr. Callendar's opinion that his system pattern as well as the test results of the test that he and the other doctors ran were consistent with the diagnosis of injury related to toxic exposure.
Dr. Raymond Harbison, who is a toxicologist but not a medical doctor and who never examined Timothy M. Sandbom, testified that while isocyanates like MDI and [sic] well as MCB might, under certain circumstances, cause injury to the human body, nonetheless neither was `neurotoxic' and neither was capable of causing Timothy M. Sandbom brain damage. Dr. Harbison went on to say that there was no scientific literature supporting Dr. Callendar's assertain [sic] that MDI was `neurotoxic' and further that these chemicals would not been [sic] in a form or concentration to have caused significant injury to Timothy M. Sandbom.
Dr. Callendar's deposition was taken in rebuttal and in that deposition Dr. Callendar points to scientific articles which support his assertion that these chemicals are neurotoxic and further testified that Timothy M. Sandbom's exposure was under circumstances totally consistent with the injuries and damages he suffered.
After reviewing the extensive evidence on this point, the Court accepts the testimony of Dr. Callendar, which it finds to be supportive [sic] by and consistent with the other testimony of other treating physicians, as well as the medical tests that were performed on Timothy M. Sandbom. The testimony of Dr. Harbison is contradicted not only by the testimony of Dr. Callendar but also by the articles produced by Dr. Callendar in support of his own position. For instance, Dr. Harbison in his testimony testified that the isocyanate which did damage to thousands in India (a member of the same chemical family as MDI) was, like MDI, not a neurotoxin and incapable of causing any kind of neurological damage. This was contradicted by a recent article which Dr. Harbison admitted in his trial testimony that he was unaware of (A Recent Scientific American, article on the victims of Bhopal). (deposition page references omitted.)
After reviewing the entire record, we conclude there is a reasonable basis for the trial court's reliance on Dr. Callender's testimony. There is also a reasonable basis for the trial court's finding that Mr. Sandbom's condition was caused by toxic exposure at the BASF plant during the August 8, 1986, incident. See Sistler v. Liberty Mutual Insurance Co., 558 So.2d 1106 (La.1990). Consequently, these findings by the trial court are not manifestly erroneous. Stobart v. State, 617 So.2d at 882.

ASSIGNMENT OF ERROR NO. THREE
In this assignment of error, BASF contends that the trial court's determination that *361 Mr. Sandbom is permanently disabled is not supported by the evidence. BASF argues that the testimony of Drs. Rostow, Callender and Ehrlich is "insufficient as a matter of law."
When queried regarding Mr. Sandbom's ability to return to work in the future, Dr. Ehrlich responded:
A. I think he is disabled from working from the first time that I saw him because of the intense anxiety disorder that he had originally, and as that was more controlled, the organic brain syndrome or memory disturbance that he has. He is also not too smart.
Q. Do youI'm sorry, go ahead.
A. He tested out, I think, about at an IQ of 77. So, he is only sixhe is only exceeding six percent of the population, something like that, in intelligence. And, if you have got a borderline mentally retarded person and you add a panic disorder to it, and a fear of going into any plants, and a fear of driving, because that precipitates his panic disorder and symptoms of depression, you have gotI think you have got somebody that's very likely not just impaired and can't work now, but maybe never will be able to work.
Q. Well, that's my next question. Based on having treated this patient for some five years and based on the kinacity, if you will, of the symptoms, is it your opinion, more likely than not, that his inability to work is permanent?
A. I'm not sure. I think it's really going to be a function of can he think well enough and can he remember well enough to do a job. If you go on what Dr. Rostowif I referred him and I said I would base it on what his current organic brain syndrome is, according to Dr. Rostow's testing, I would say it is going to come out having talked to him, I would say it is going to come out that he is permanently disabled.
Q. All right.
A. But, there is some question in my mind that he might be able to do something.
. . . . .
A. More likely he is permanently work disabled.
Q. All right. Now, with respect to the organic brain damage, I assume that is also permanent?
A. Yes.
In Dr. Callender's opinion, Mr. Sandbom has peripheral and central nervous system lesions which are permanent. At time of trial, he was totally disabled and had a very poor prognosis.
The trial judge found that Mr. Sandbom was incapable of returning to his former occupation, and it was also unlikely that he would be able to return to steady employment of any kind. After careful review of the record, we conclude that the trial judge's finding of permanent disability is reasonable in light of the record reviewed in its entirety and is not manifestly erroneous. Stobart v. State, 617 So.2d at 882.
BASF contends that the trial court abused its discretion in the award of $218,012 for future medical expenses. Future medical expenses need not be established with mathematical certainty. However, they must be established with some degree of certainty, and the plaintiff must show that expenses more probably than not will be incurred. Harris v. Tenneco Oil Co., 563 So.2d 317 (La.App. 4th Cir.), writ denied, 568 So.2d 1062 (La.1990). Further, the trial court has much discretion in granting damage awards, including special damage awards. La.C.C. arts. 1999 and 2324.1; Sinor v. National Casualty Co., 633 So.2d 720 (La.App. 1st Cir.1993).
The testimony of Dr. Ehrlich clearly establishes that, in order to function at least as well as at time of trial, Mr. Sandbom will need ongoing monthly, or sometimes weekly, psychotherapy, continuous anti-anxiety medication and continual monitoring of his prescription drug intake. The amount of the award was based on calculations by economist, Dr. Randolph Rice. Dr. Rice calculated *362 the monthly cost of psychotherapy sessions ($1,200 per year); the monthly cost of group therapy sessions ($2,160 per year); and the annual medication cost ($1,460). He calculated the present value of these expenses over forty-two years of life expectancy as $218,012, which is the amount awarded. We find no abuse of discretion on the part of the trial judge.

PLAINTIFFS ASSIGNMENTS OF ERROR

(A) QUANTUM
Mr. Sandbom alleges as error that the award of general damages in the sum of $250,000 is inadequate.
The standard of appellate review of a general damage award is clear abuse of discretion. The discretion of the finder of fact is vast and should not be disturbed unless it is, in either direction, beyond what a reasonable trier of fact could assess under the circumstances. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
We are aware that Mr. Sandbom's life has changed due to this injury. He is now forgetful, short tempered with his family, isolated, moody, and he is subject to panic attacks. However, we are of the opinion that a general damage award of $250,000 is well within the range of what a reasonable trier of fact could assess under the circumstances. We find no abuse of discretion. This assignment is without merit.

(B) PLAINTIFFS' ASSIGNMENT OF ERROR NO. TWO
In this assignment of error, plaintiffs allege that the trial court erred in awarding to Aetna, the workers' compensation carrier, reimbursement for workers' compensation benefits which were paid to Mr. Sandbom. Plaintiffs argue that, pursuant to the terms of the purchase order or contract between Louisiana Environmental and BASF, Louisiana Environmental "waived its right to subrogation and reimbursement of any and all amounts paid by it, including workers' compensation benefits." Thus, Aetna's rights for reimbursement were waived and thereby extinguished by the terms of the contract between Louisiana Environmental and BASF.
Paragraph nine of the purchase order contract provides:
Contractor, at its sole cost and expense, agrees to defend, indemnify, and hold harmless Purchaser from and against any and all liability, damage, loss, cost, expense, claims, demands, suits, judgments, or recoveries for or on account of any injury to or death of persons or damage to property, including, without limitation, injury (including death) or damage to persons or property utilized by the parties hereto, which occurs in any way, directly or indirectly, as the result of Contractor's prosecution of the work. In no event, however, shall Contractor be liable for incidental or consequential damages. Contractor hereby releases and waives all rights of subrogation possessed by its insurers with respect to the foregoing indemnification.
When an injury occurs for which workers' compensation is payable, under circumstances creating in some third person a legal liability to pay damages, the employee, in addition to claiming workers' compensation benefits, may also proceed against the third person to recover damages for the injury. Additionally, "[a]ny person having paid or having become obligated to pay compensation... may bring suit against such third person to recover any amount which he has paid or becomes obligated to pay as compensation to such employee." La.R.S. 23:1101(B).
The right of a workers' compensation insurer to bring suit against a third party to recover compensation benefits which the insurer has paid on behalf of the injured employee is likewise limited to cases where the injury creates a legal liability in a third person tortfeasor to pay damages. La.R.S. 23:1101. Stafford v. Hearn Construction Co., Inc., 632 So.2d 775 (La.App. 1st Cir.1993), writs denied, 94-0252 (La. 4/22/94); 637 So.2d 155 and 94-0735 (La. 4/22/94); 637 So.2d 155.
*363 An employer may contractually waive the employer's right to reimbursement of compensation benefits paid an employee. Additionally, the insurance carrier may waive such rights in its policy of insurance with the employer, or by separate agreement with the third party. Harris v. Tenneco Oil Co., 563 So.2d 317. However, absent a specific waiver by the carrier, the carrier remains entitled to reimbursement for compensation benefits paid. La.R.S. 23:1101 and 1103. No evidence was presented that Aetna waived its right of reimbursement in either its policy of insurance or by separate agreement. It is consequently entitled to reimbursement for the benefits paid.

POLLUTION EXCLUSION
Twin City Fire Insurance Company, s/h/a The Hartford (Twin City), issued a general liability policy covering BASF which was in effect at the time of Sandbom's injury. The policy contains what Twin City counsel terms an absolute pollution exclusion. The policy refers to the exclusion as a "pollution hazard" exclusion. It excludes coverage for claims which arise out of a pollution hazard. The policy provides that:
As used in this exclusion, `pollution hazard' means an actual exposure or threat of exposure to the corrosive, toxic or other harmful properties of any solid, liquid, gaseous, or thermal pollutants, contaminants, irritants or toxic substances, including smoke, vapors, soot, fumes, acids or alkalis, and waste materials consisting of any of the foregoing.
Based upon this language the trial court held BASF was not covered by the policy for the damages to Sandbom. We disagree.
Pollution exclusions have been the basis of litigation for several years. As pointed out by the supreme court in South Central Bell Telephone Co. v. Ka-Jon Food Stores of Louisiana, Inc., 93-2926 (La. 5/24/94); 644 So.2d 357, 362:
The history of the "absolute" pollution exclusion ... reveals that insureds have exploited insurance coverage and insurers have abused pollution exclusions: at one end of the spectrum are the intentional industrial polluters of hazardous waste who compel insurers to bear their environmental cleanup costs, while at the other end are the insurers who deny coverage of nonenvironmental accidents even though the accidents have no greater connexity to the pollution exclusion than does a morning drive to work.
This case falls in the latter category.
The pollution exclusions were originally added to general liability policies in order for the insurers to specifically exclude from coverage damages resulting from intentional discharges of pollutants and contaminants. La.Environmental Handbook, § 23:9. Litigation arose from excepting from the exclusion the "sudden and accidental" discharge, release, escape or dispersal of pollution. Consequently, that exception was removed from the exclusion, resulting in the modern day absolute pollution exclusion. La.Environmental Handbook, § 23:9. Insurers have attempted to use that exclusion to deny coverage in areas where it would normally be anticipated that a general liability policy would provide coverage, such as, when carbon monoxide escaped from a home gas heater, and where a smoke cloud from burning trash caused an accident. This led courts to limit the pollution exclusion to active industrial polluters who emit pollutants over an extended period. Avery v. Commercial Union Insurance Co., 621 So.2d 184 (La.App. 3d Cir.1993); Thompson v. Temple, 580 So.2d 1133 (La.App. 4th Cir.1991). In South Central Bell Telephone Co., 93-2926 (La. 5/24/94); 644 So.2d at 364, the supreme court held the standard absolute pollution exclusion to be ambiguous as a matter of law, concluding that, with a literal application of the exclusion, routine business accidents would not be covered. Consequently, the court reasoned this result could not have been intended, and because the exclusion did not express the common intent of the parties, it was ambiguous and had to be interpreted to provide coverage. However, a rehearing was granted, the judgment extending coverage was vacated, and the case was remanded for a determination of whether the exclusion interpreted by the court was even applicable to the policy at issue. South Central Bell Telephone Co. v. Ka-Jon Food Stores of Louisiana, *364 Inc., 93-2926 (La. 9/15/94); 644 So.2d 368. However, at the same time the judgment of the court of appeal, which had denied coverage, was also vacated. South Central Bell Telephone Co., 93-2926 (La. 9/15/94); 644 So.2d at 370. Consequently, the correct interpretation of the absolute pollution exclusion is unsettled.
All of the previous pollution exclusions we have reviewed contemplate the discharge, dispersal, release or escape of the pollutant or contaminate. The exclusion in the policy in this case goes even further. It excludes coverage for exposure, or even the threat of exposure, to the pollutants, contaminates, irritants or toxic substances, without reference to their discharge, dispersal, release or escape.
In spite of the broad language, the exclusion is still termed a "pollution hazard" exclusion. Pollution occurs only when there is some type of dispersal of the polluting substance. THE AMERICAN HERITAGE DICTIONARY OF THE NEW ENGLISH LANGUAGE, NEW COLLEGE EDITION, 1015 (1976) defines pollution as "The contamination of soil, water or the atmosphere by the discharge of noxious substances." (emphasis added). Consequently, it is contradictory to have a pollution hazard exclusion, which excludes without pollution, i.e., without discharge, dispersal, release or escape. In that respect, the exclusion is vague and must be interpreted to provide coverage where the polluting, contaminating or toxic substance has not escaped, or been discharged, dispersed or released.
Sandbom was injured by entering the area where the chemicals were contained. They had not been discharged, dispersed or released; nor had they escaped. Consequently, the pollution exclusion does not apply to this incident, and coverage is owed BASF by Twin Cities. The judgment of the trial court in this respect is reversed.
For the foregoing reasons, we affirm the judgment of the trial court in part and reverse in part. Costs are to be paid by appellants, BASF and Twin City.
AFFIRMED IN PART, REVERSED IN PART AND RENDERED.
NOTES
[1] Judge Hillary J. Crain, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The doctor's name is spelled two ways, "Callender" and "Callendar," throughout the record. However, we believe that "Callender" is the correct spelling.